290

ALFRED STONE, Respondent, *v.* CHARLES GOODMAN and Others Appellants, Impleaded with J. KIPP HAWES, Also Known as JOHN KIPP HAWES, Defendant.

First Department, May 4, 1934.

*Francis L. Driscoll* of counsel [*Lorenz J. Brosnan* with him on the brief; *Lorenz J. Brosnan,* attorney], for the appellant Charles Goodman.

*Alexander Orr, Jr.,* of counsel [*G. Everett Hunt* with him on the brief; *Evans, Hunt & Rees,* attorneys], for the appellant The Brunswick Radio Corporation.

*William B. Shelton* of counsel [*Murray G. Jenkins* with him on the brief; *Jenkins, Dimmick & Finnegan,* attorneys], for the appellant (American) Lumbermen's Mutual Casualty Company of Illinois.

*Alvin C. Cass* of counsel [*Jacques W. Bacal* with him on the brief; *Henry Portnow,* attorney], for the respondent.

MARTIN, J.   On April 30, 1931, the plaintiff suffered an injury in the course of his employment through a fall from a scaffold, by striking an iron bar which lay across a vat beneath.   In falling he straddled the bar with his legs, struck his stomach on the edge of the vat and received severe injuries, from which he suffered pains in the abdomen.

The defendant Brunswick Radio Corporation, his employer, sent him to the office of a Dr. Russell.   When the plaintiff reached that office, because of the absence of Dr. Russell, he was examined by another doctor.   Later, however, Dr. Russell examined him and found that he was suffering from an umbilical hernia and contusions of the right lower groin.

On May 4, 1931, the plaintiff was examined by Dr. Hawes, one of the defendants in this action, in whose favor a verdict was directed.   Dr. Hawes advised an operation, and eventually the plaintiff decided to have the operation performed.   He was referred by Dr. Hawes to the Broad Street Hospital to be operated upon by Dr. Goodman.

Before deciding to have the operation performed and on May 19, 1931, the plaintiff consulted and was examined by a Dr. Rivkin, whom he personally selected and paid.   He also went to the Hospital for Ruptured and Crippled, and was there examined on May 20, 1931.   He finally decided to have the operation performed at the Broad Street Hospital in accordance with the wishes of his employer's insurance carrier, and on June 12, 1931, went to the hospital for that purpose and was there examined by Dr. Goodman who operated upon him the following day.

The question here presented is whether Dr. Goodman was within his rights in operating upon the plaintiff for a direct inguinal hernia on the left side, or whether he was bound to confine his

efforts to an operation on the umbilical hernia and the oblique inguinal hernia on the right side.

The plaintiff says that he went to the hospital to be operated upon for the umbilical hernia and a hernia on the right side; that he had no hernia on the left side, but that if he did have such a hernia, the doctor had no right to operate upon it without his consent.

The plaintiff admitted that Dr. Goodman examined his right side and his left side and also examined him for an umbilical hernia; that the doctor asked if he had pain on the left side; that he told the doctor he had no pain there. Regarding the umbilical hernia, there is no dispute, it being conceded by the plaintiff that he had such a hernia and no claim is made that Dr. Goodman was guilty of any malpractice in operating thereon.

While the plaintiff at first denied that anything was said about the left side, on cross-examination he was forced to admit that fact. He testified as follows: " Q. Now, sir, I wrote down, and if I am mistaken you may tell me, you remember distinctly Dr. Goodman examined you on the left side, didn't he? A. When? Q. At the time of his examination? A. On the 12th? Q. Yes. A. He examined both sides. Q. You remember distinctly that he examined you on the left? A. Yes. Q. You said that while he was examining you on the left side he said to you, ' Didn't you ever have any pain in your left side? ' Do you remember telling us that? A. He asked me where the pain was. Q. Now didn't you say while examining you on the left side he said to you, ' Didn't you ever have any pain on this left side? ' A. Yes. Q. You remember that, don't you? A. Yes, I remember that."

Dr. Goodman testified that on June 12, 1931, the day before the operation, he met the plaintiff at the Broad Street Hospital and after obtaining his history made a very thorough examination of his abdomen. He says he found him suffering from an umbilical hernia and a direct inguinal hernia on the left side; that this latter condition was dangerous and required immediate attention. He also found symptoms of a slight indirect oblique inguinal hernia on the plaintiff's right side, but was of the opinion that plaintiff's trouble on the right side was due to adhesions which could be relieved in the course of the operation on the umbilical hernia. He said: " I asked him what he complained of. He said: ' Pain in the belly.' He said that he had been told that he had trouble with his navel and in the right groin. * * * In examining his abdomen I found that he had a protrusion at the site of his navel. * * * He had tenderness extending along the right side of his abdomen, of his belly. On the right side he had symptoms of a

small, incomplete, indirect, oblique inguinal hernia. On the left side he had a direct hernia. The direct hernia on the left side permitted the introduction of the fingers directly into the peritoneal cavity, in contradistinction to the one on the right side."

The doctor testified that the condition on the left side could not be discovered by looking at it and could not be ascertained except by introducing the finger, and that upon tugging upon the abdominal wall the patient complained of pain and a tender area. The examination disclosed that the plaintiff was suffering not only from an umbilical hernia which everyone agreed upon, but from a hernia on both the right and left sides; the one on the left side being dangerous and requiring immediate operation for the reason that a direct hernia is potentially more dangerous than an indirect hernia. It was at this time that Dr. Goodman told the patient about the left hernia.

Dr. Goodman also testified that before operating, he saw the written consent to the operation which the plaintiff had signed; that there was no limitation stated therein, and that the nature or extent of the operation, or the necessity therefor could not be fully determined until a complete examination and diagnosis was made.

Dr. Hawes, the doctor who had examined the plaintiff on May 4, 1931, and sent him to the hospital for the operation by Dr. Goodman, assisted Dr. Goodman and saw the direct hernia on the plaintiff's left side when it was pointed out to him by Dr. Goodman. He testified: " Q. Now, in the meantime, after Dr. Goodman stopped his work on the umbilicus, did you observe what next step he took so far as the left inguinal hernia was concerned? A. He started ahead on the left inguinal and when he got it open, then he called my attention to the hernia that was there. Q. When you get it open, is there hernia — is the hernia something that you can see? A. See and feel. You can put your finger on it. Q. Of course you can tell by the sense of feeling before it is ever opened, but after it is opened up, what is there to see? What do you see and what do you feel? A. You see a bulging, a pouch, a bulging. Q. That was there, was it? A. That was there, yes. Q. That was something you could see and there was no question about it? A. No question about it. Q. Did he call it to your attention? Of course, you were working on the same abdominal wall and did you see it or don't you recall? A. I saw the hernia."

If, as claimed by the plaintiff, he was sent to the hospital for a specific operation, it is remarkable that Dr. Hawes, who sent him there for the operation and who assisted Dr. Goodman, did not consider that the plaintiff had been sent to the Broad Street Hospital for an operation for a hernia on the right side.

In any event, the operation was performed on the umbilical hernia, and also for the left inguinal hernia, which Dr. Goodman said he found on his physical examination of the plaintiff and of the existence of which he informed the plaintiff. No operation was performed on the plaintiff's right side. During the operation on the umbilicus, the adhesions which both Dr. Goodman and Dr. Hawes said they found extending to the right side were separated from the omentum. The doctors were of the opinion that this treatment would relieve the plaintiff's condition on the right side and render it unnecessary to operate thereon. It was determined also, however, that if the separation of the adhesions did not suffice to relieve the condition on the right side, the advisability of an operation on that side would be considered. The question of an operation on the right side was, therefore, held in abeyance pending further observation of the plaintiff.

We have, therefore, the uncontradicted testimony of the two doctors who operated on the plaintiff and who were in the best position to know the plaintiff's condition, that the plaintiff was suffering from a direct inguinal hernia on the left side which was a serious menace not only to the plaintiff's health, but in the event of strangulation, a danger to his life and the extent of which could be fully discovered only during the operation on the umbilical hernia.

There seems to be no doubt that under such circumstances the doctor was not only justified but within his rights in performing the operation on the hernia on the left side.

No set rule can be laid down with reference to the method to be used by a doctor in operating. When a doctor makes a diagnosis and during an operation is confronted with a situation requiring the exercise of his judgment, especially in a case of this kind where the doctor first operated on the umbilical hernia and then established the necessity to operate upon the hernia on the left side, he should not be held liable when it is not shown that he improperly exercised his judgment or that he failed to use the ordinary degree of skill. The fact that Dr. Goodman was not anxious to operate is borne out by his refusal to operate on the right side because he thought it unnecessary at that time and that the condition might clear up without an operation.

In the leading case of *Pike* v. *Honsinger* (155 N. Y. 201) the court held that the rule in relation to learning and skill does not require a physician and surgeon to possess that extraordinary learning and skill which belong only to a few men of rare endowments, but such as is possessed by the average member of the medical profession in good standing. Still, he is bound to keep abreast of the times, and a departure from approved methods in general use, if it injures the

patient, will render him liable, however good his intentions may have been.

The rule requiring a physician and surgeon to use his best judgment does not make him liable for a mere error of judgment, provided he does what he thinks is the best after careful examination. A physician's and surgeon's implied engagement with his patient does not guarantee a good result, but he promises by implication to use the skill and learning of the average physician, to exercise reasonable care and to exert his best judgment in the effort to bring about a good result. (*Pike* v. *Honsinger, supra.*)

Although the plaintiff obtained a large judgment against the doctor, the insured and the insurance carrier, we find some difficulty in finding on what theory the case was submitted to the jury. On the argument, counsel for respondent had difficulty in stating the ground of liability of the defendants other than the defendant Dr. Goodman. The trial justice evidently sent the case to the jury on the theory of malpractice, trespass and negligence and stated that the employer and the insurance carrier were liable if the jury found that Dr. Goodman was guilty of malpractice, trespass or negligence; that in such event the jury could find against either or both.

The trial judge then charged the jury that " You cannot find against either the employer or the carrier merely for negligence in employing the doctors, unless there is some proof that the doctors were incompetent or unskillful." We later find the following: " I ask your Honor to charge the jury that in this case there is no question but that Dr. Goodman possessed the necessary competency and qualifications for the treatment of this plaintiff. The Court: There is no charge that he did not. No claim that he did not possess the proper qualifications."

On the argument it was conceded that Dr. Goodman was a well-qualified doctor of high standing. Added to this admission there is proof that he was not only properly qualified but had operated on more than a thousand patients suffering from hernia, and was an exceptionally qualified surgeon.

In the present case he made a thorough examination and diagnosis and decided the nature of the operation necessary to aid the patient, who consented in writing thereto. The circumstances surrounding the signing of the consent as well as the physical facts are strong evidence that the plaintiff was not testifying to the truth in this case. When confronted with his written consent for the operation he testified in effect that he did not know what he was signing; that he was without his glasses and could not read; and that it was signed while he was lying on a stretcher being carried into the

operating room; that an orderly held the consent over his head, also holding a board in that position, against which board the consent was resting, and that he signed the consent with a pen and ink in that manner without reading it and while under the influence of a drug.

An examination of plaintiff's signature to the consent shows that it is legibly written, exactly on the line provided for signatures, and shows no evidence of having been written under such difficulties, nor any evidence that plaintiff was under the influence of a drug. Any one who can sign his name as clearly and legibly and on such a straight line as plaintiff did, could not have been under the influence of a drug, and must have been conscious of what he was doing. The writing upon the straight line does not indicate that the plaintiff required glasses to find the line or its location, and would indicate also that the plaintiff must have had his glasses if it be true that he could not see to write without them. Furthermore, the signature was witnessed by Miss Gordon, the reception clerk in the hospital. She testified that she was at present parish secretary in St. John's Church in Yonkers and that when this paper was signed she was registrar and admitting officer at the Broad Street Hospital; that the paper was signed in the admitting office of the hospital on the main floor, and that plaintiff was perfectly conscious at the time; that she never was inside of the operating room and did not know which floor it was on; that the office was on the " ground floor in the main entrance hall as you come in the door " and that is where the paper was signed. It is wholly improbable that if the paper had been signed in the place and under the conditions testified to by plaintiff, Miss Gordon's signature would have been on it when her work was wholly confined to the first floor.

It is somewhat difficult to follow the ramifications of this case. At one time it is being tried against all the defendants for malpractice; at another time for trespass and at another for negligence, and finally the plaintiff says it is against the doctor for malpractice, against one defendant for either trespass or negligence and against another defendant for assault.

The charge to the jury appears to have considered all these theories at different times, and finally we have the theory stated as follows: " If you find that the doctors, or either of them, were guilty of negligence in operating when they should not have done so, or in not operating when they should have operated, or if you find that they or either of them were guilty of trespass through having operated without the plaintiff's consent, you will also find against the employer and the carrier, unless you find that the carrier

stepped into the shoes of the employer, and gave the plaintiff the same attention that the law I have read you says the employer was required to give, in which event you will only find, if you find against the doctors, against them and the carrier.

" If you do not believe the carrier stepped into the shoes of the employer, you can only find against the doctors and the employer if you believe they are liable under the law I have given you."

The charge was erroneous under the proof in this case. Assuming the facts stated by plaintiff to be true, the defendants, other than Dr. Goodman, were not liable for his acts.

In *Laubheim* v. *De Koninglyke Nederlandsche Stoomboot Maatschappy* (107 N. Y. 228) the court said: " If, by law or by choice, the defendant was bound to provide a surgeon for its ships, its duty to the passengers was to select a reasonably competent man for that office, and it is liable only for a neglect of that duty. [*Chapman* v. *Erie R. Co.*, 55 N. Y. 579; *McDonald* v. *Hospital*, 120 Mass. 432; *Secord* v. *St. Paul, M. & M. R. Co.*, 18 Fed. Rep. 221.] It is responsible solely for its own negligence and not for that of the surgeon employed. In performing such duty it is bound only to the exercise of reasonable care and diligence and is not compelled to select and employ the highest skill and longest experience."

Dr. Goodman was an experienced surgeon and was shown to be exceptionally able. He had operated many times upon patients for hernia and was constantly in attendance at leading hospitals. When the insured and the insurance carrier employed such a well-qualified doctor, their duties ceased. They were not liable for anything that occurred thereafter.

In addition to the fact that the judgment is wholly against the overwhelming weight of evidence and that no malpractice or breach of contract was proved, the plaintiff failed to establish liability of any kind or nature upon the defendants The Brunswick Radio Corporation and (American) Lumbermen's Mutual Casualty Company of Illinois.

Our attention has also been called to serious errors in the admission of evidence. The court admitted hospital records purporting to contain a diagnosis of the case, without showing by whom made, or if made by a doctor or person competent to make such records, or to show that they were anything more than hearsay or information given by the patient or some unknown person. That was clearly error. (*Johnson* v. *Lutz*, 253 N. Y. 124.)

The judgment and order should be reversed, with costs, and the complaint dismissed, with costs, as to the defendants The Brunswick Radio Corporation and (American) Lumbermen's Mutual Casualty Company of Illinois; the action severed, and a new

trial ordered as to the defendant Charles Goodman, with costs to said appellant to abide the event.

FINCH, P. J., MERRELL and UNTERMYER, JJ., concur; O'MALLEY, J., dissents as to defendant Charles Goodman and votes to affirm as to said defendants.

Judgment and order reversed, with costs, and the complaint dismissed, with costs, as to the defendants The Brunswick Radio Corporation and (American) Lumbermen's Mutual Casualty Company of Illinois; the action severed, and a new trial ordered as to the defendant Charles Goodman, with costs to said appellant to abide the event.