Henry W. Lengyel, J.
This claim, initially for damages in the sum of $4,000,000, was duly filed. Said damages allegedly arose out of claimant’s confinement in Matteawan State Hospital from May 19,1947 to September 8,1961.
The first and third causes of action set forth in said claim were dismissed by order of Judge Sidney Squire dated December *695 22, 1965. (See Whitree v. State of New York, 48 Misc 2d 673, affd. 26 A D 2d 720, mot. lv. to app. den. 18 N Y 2d 583.)
The second cause of action was predicated on the alleged negligence of the State doctors in providing psychiatric and ordinary medical care to the claimant while an inmate at Matteawan. An interesting facet of said cause of action is the claimant’s position that, if proper psychiatric care had been provided, Mr. Whitree would have been released from Matteawan many years before his release was finally accomplished on September 8, 1961. Thus, in effect, although the second cause sounds in tort based essentially on the alleged malpractice of the State doctors, the main item of damage relatable to this cause of action would be the false imprisonment of the claimant for a substantial portion of the 14 years, 3 months and 20 days of confinement.
The fourth cause of action was based on the alleged injuries received by this claimant during his confinement. Said injuries were allegedly caused by beatings inflicted by hospital employees and other patients.
In the second and fourth causes of action, claimant realleged paragraphs 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 17, 18, 19, and 20, all as set forth in the first cause of action. The first and third causes of action were dismissed in Whitree v. State of New York (supra), and the State takes the position that such dismissal is res judicata not only as to the first and third causes of action but also as to the realleged paragraphs in the second and fourth causes of action. Of course, said- decision is res judicata as to the first and third causes of action. We also find said decision res judicata on any points of law and fact raised by said realleged paragraphs and which were directly ruled upon in said decision. We are bound by said determinations. (See Nastasi v. State of New York, 275 App. Div. 524, affd. 300 1ST. Y. 473.) However, as stated by Judge Squibb in Whitree v. State of New York (supra, pp. 675-676):
“ Although many of these factors which cannot sustain a pleading are alleged in the second cause of action, there are also averments that the defendant was negligent in failing ‘ to conduct regular treatment and periodic comprehensive examinations of the claimant ’ and 1 in failing to provide ordinary medical care in addition to failing to attend to and to treat the personal injuries which the claimant sustained from beatings he suffered at the hands of fellow patients and attendants in the employ of the defendant at said State hospital. ’
“ The foregoing is amplified in claimant’s bill of particulars, verified by the claimant. * * *
*696 ‘ ‘ These issues reflect questions of fact which must be resolved at a trial. ’ ’
Mr. Whitree was born on January 22, 1899 and was 68 years of age on the date of the trial.
On March 25, 1945, he was arrested in the City of New York on the charge of stabbing one John O’Connor. On May 21,1945, he was indicted for assault second degree, to which he pleaded not guilty on May 24,1945. On November 15, 1946, he appeared with counsel and pleaded guilty to assault third degree. On December 6, 1946, he was given a suspended sentence by the Court of General Sessions and was placed on probation. It should be noted that he was released on bail in the assault second degree charge on April 13, 1945, and that he appeared at the Court of General Sessions on 18 different dates before withdrawing his plea of not guilty and pleading to the reduced charge. It was Mr. Whitree’s testimony at the trial that he was not guilty of the assault second degree but that he finally pleaded guilty to assault third degree because he could not afford to lose so much time from work; and, also could not afford to continue to pay his lawyer for each appearance at the Court of General Sessions. Certainly, this lengthy time between indictment and final disposition causes one to ruminate upon the verity of the statement, “ Justice delayed is justice denied.”
As stated above, after the plea of guilty, the Court of General Sessions suspended sentence and placed the claimant on probation. The length of probation was not set forth in the record of the Court of General Sessions presented in evidence at the trial. However, we note that “ The period of probation may not * * * extend * * * in the case of any * * * defendant convicted of an offense less than a felony * * * beyond three years.” (Code Grim. Pro., § 933, as added by L. 1931,' ch. 423, repealed by L. 1967, ch. 681.) As assault third degree was a misdemeanor in 1946 (Penal Law, § 245) the period of probation, assuming no violations, could be no longer than three years from December 6, 1946. There was a violation of probation and Whitree was taken into custody on April 7, 1947. On April 29, 1947, he was ordered to Bellevue Hospital for formal psychiatric examination. Assuming no psychiatric problems on April 29, 1947 and a proper arraignment and hearing on that date (Code Grim. Pro., § 935), one of two things could have happened to him. The Court of General Sessions could have revoked his probation and sentenced him on his plea of guilty to assault third degree. Such sentence, depending on the court’s findings, could have been for one year under section 245 of the then existing Penal Law; or, for an indeterminate period *697 no longer than three years under section 203 of the then existing Correction Law. (See, also, People ex rel. Montana v. Warden of New York City Penitentiary, 171 Misc. 533.) Of course, the Court of General Sessions could have continued or modified his probation. It could not, however, extend the period of probation beyond the original three years. (People v. Valle, 7 Misc 2d 125.) Assuming that the Court of General Sessions had utilized section 203 of the Correction Law and arbitrarily utilizing April 29, 1947 as the sentencing date, the maximum term that Whitree could have been confined to jail, assuming sanity, would have ended on April 29, 1950. The above possibilities have been set forth, not in an effort to go behind the commitment order which was valid on its face, but to point up that the claimant was incarcerated for roughly eleven years more than the criminal term he could have received. Such incarceration should be premised upon careful, thoughtful, and informed expert medical basis. We do not find that such was the case in the medical treatment afforded this claimant.
On April 11, 1947, claimant was committed to Bellevue Hospital for observation and on April 29, 1947, the Court of General Sessions directed that Whitree be formally examined by two psychiatrists at said hospital. He Avas examined by íavo qualified psychiatrists Avho duly reported to the Court of General Sessions that he Avas in such a state of insanity that he Avas incapable of understanding the charge, or of making his defense. The technical diagnosis Avas paranoid condition in a chronic alcoholic. On May 15,1947, he Avas committed to MatteaAvan State Hospital by order of the General Sessions Court.
Whitree Avas transferred to MatteaAvan State Hospital on May 19, 1947, AArhere he Avas admitted by Dr. William C. Johnston. A copy of the commitment order, Exhibit “ P ”, accompanied Whitree to the State Hospital and Avas delivered to Dr. Johnston.
Before Ave further consider the factual situation presented at the trial, avc must determine the effect of court orders dismissing Avrits of habeas corpus AAThich Avere granted to Mr. Whitree upon his application. The order dismissing the initial Avrit of habeas corpus Avas served upon him on December 20, 1954. The order dismissing the second Avrit of habeas corpus Avas seiwed upon him on July 3, 1956. Thereafter, íavo applications for such Avrits Avere denied (May 9, 1957 and February '3, 1959). The third Avrit of habeas corpus Avas indefinitely adjourned on April 27, 1959. On March 3, 1961, an application for a fourth Avrit of habeas corpus Avas granted. After a hearing, at Avdiich Whitree Avas represented by counsel for the first time, *698 it was determined that he had not been committed in accordance with law and the writ was granted. He was remanded to the Court of General Sessions for further proceedings to determine his mental condition.
In Rosario v. State of New York (42 Misc 2d 699) it was held that denial of a writ of habeas corpus brought by an inmate of a State hospital for the criminally insane was res judicata on the question of the sanity of said inmate from his date of confinement to the date of the order denying said writ. The court stated (p. 703) that:
“ The presumption of fact is that the condition of insanity continues to the present time, with the result that the burden of proving sanity is upon the person seeking release by habeas corpus after commitment to a State hospital for the criminally insane. * “ *
“ The purpose of the institution by the claimant in person of the three habeas corpus proceedings was to obtain a judicial determination on the return days thereof of the sanity of the claimant * * * In each instance, the court found that claimant had not recovered his sanity. On this motion, the court holds * * * there was an existing final judgment or decree of a court of competent jurisdiction rendered on the merits, determining the same cause of action between the parties, but only on the issue of the then sanity of claimant up to such time. Questions as to the medical, rehabilitative and custodial care given claimant while an inmate of the hospital, however, were not and could not properly have been within the scope of the habeas corpus proceedings, and the orders entered in such proceedings were not necessarily determinative of such matters. These remain questions of fact which can be decided only upon a trial of the claim. ’
On the trial of this claim, Rosario v. State of New York (51 Misc 2d 790) the Trial Judge, followed the doctrine of res judicata, which had become the law of the case as there was no appeal from the decision on the motion. He also reaffirmed the position of the motion judge. (Cf. Young v. State of New York, 32 Misc 2d 965, 968.)
If we determined to follow the law set forth in the Rosario cases, we would have to rule out any consideration of medical and custodial care rendered Mr. Whitree from May 19, 1947 to July 3, 1956. However, although we have very deep respect for our two colleagues, we are constrained to disagree with them on the effect of the denial of writs of habeas corpus, particularly when the relator was not represented by counsel.
*699 There is, of course, no question that the issues determined when a writ of habeas corpus is granted are res judicata in any subsequent action arising out of the same factual situation. (Nastasi v. State of New York, 275 App. Div. 524, affd. 300 N. Y. 473, supra; Williams v. State of New York, 9 A D 2d 415, 417, affd. without opn. 8 N Y 2d 886.) However, we do not find the same situation occurs when a writ of habeas corpus is denied. To so find would make a gross anomaly out of section 426 of the Mental Hygiene Law, section 446 of the Correction Law, and CPLR 7003 (subd. [b]). As stated in the Advisory Committee Notes to said CPLR 7003 (subd. [b]): “ This provision is based upon section 2244 of title 28 of the United States Code. It continues the common law and present position in this state that res judicata has no application to the writ. * * * Nevertheless, courts do not look with favor on successive applications for the writ which raise no new grounds or supply no new facts, and they may give weight to a prior refusal to grant the writ. ’ ’ (Third Preliminary Report of Advisory Comm, on Practice and Procedure, 1959, pp. 63-64.) To permissively give or not give weight to a prior denial of a writ is a far cry from the mandatory requirements implicit in res judicata. In our opinion, Troutman v. State of New York (273 App. Div. 619, 620, 622) is in point on this issue. “ Thereafter, and between January 28, 1937 and December 21, 1943, claimant obtained fourteen writs of habeas corpus to obtain his release upon the ground that he was not insane. * * * the only issue presented in each instance was the sanity of the claimant. * * * Whether he was sane during any of the period between the date of his original commitment and the date of his release is a matter of proof concerning which we express no opinion.” (Emphasis added.) (See, also, People ex rel. Lawrence v. Brady, 56 N. Y. 182, 192; People ex rel. Sabatino v. Jennings, 221 App. Div. 418, 420, affd. without opn. 246 N. Y. 624; Post v. Lyford, 285 App. Div. 101, 104, 105; Harris v. State of New York, 21 Misc 2d 89, 90; People ex rel. Siskind v. Silberglitt, 5 Misc 2d 983; 22 Carmody-Wait 2d, New York Practice, § 139:8; 46 Cornell L.Q. 483 [1961].)
We particularly believe the doctrine of res judicata should not apply when the relator whose writ has been denied was not represented by counsel. We point to Rosario v. State of New York (supra), three writs presented without counsel denied; but, release, without even the necessity of a writ, when counsel was obtained; People ex rel. Butler v. McNeill (30 Misc 2d 722) four writs denied; but, writ granted and petitioner discharged the first time he was represented by counsel. The claim now before this court, two writs without counsel denied; but, writ *700 granted and petitioner discharged the first time he was represented by counsel. It was not, of course, until People ex rel. Roger v. Stanley (17 N Y 2d 256 [1966]) that the constitutional right to representation in habeas corpus proceedings was established. (See People ex rel. Simpkins v. Director of Pilgrim State Hosp., 22 A D 2d 699. Cf. People ex rel. Williams v. La Vallee, 19 N Y 2d 238.) The right to counsel has developed and expanded with remarkable celerity in recent years. (See People ex rel. Combs v. La Vallee, 29 A D 2d 128.) This demonstrably indicates the awareness that without counsel the average litigant does not possess sufficient acumen or training to present his side of the issues. To hold that one, who is involuntarily without counsel, is barred by the strict doctrine of res judicata does not square with the thrust of the case law that has been developing.
The parties requested an opportunity to file proposed findings of fact and conclusions of law under CPLB 4213. We received 148 findings of fact and 30 conclusions of law from the State and 618 findings of fact and 45 conclusions of law from the claimant. The State’s findings were generally requests to rule on essential facts and did not contain an over abundance of requests to find evidentiary facts which were merely essential to a determination of the essential facts. (See Ryan & Son v. Lancaster Homes, 22 A D 2d 186, affd. without opn. 15 N Y 2d 812.) The State’s proposed findings were presented in reasonably logical sequence and were, as we had directed, referenced into this rather voluminous record by book and page numbers. The trial record contained 1,864 pages plus 293 pages of examinations before trial which were received in evidence plus numerous other exhibits. The claimant’s proposed findings of fact were not referenced into the record and exhibits when initially received. We returned same to claimant’s counsel with instructions to so reference them. They were returned to us with about 520 of the proposed findings referenced as directed and the balance not referenced into the record. The claimant’s findings were grossly repetitious; they were presented in an erratic and illogical manner ; and, they conveyed the impression of attempting to mislead the trial court. We recommend to counsel the decision of Ryan & Son v. Lancaster Homes (supra, pp. 191 and 192). (See, also, 4 Weinstein-Korn-Miller, N. Y. Civ. Prac., pars. 4213.01 and 4213.02.)
For the reasons set forth above, we have not marked the claimant’s proposed findings and conclusions. We have endeavored to set forth in this decision the basis for the result obtained. We consider that such procedure fully complies with the require *701 ments of CPLR 4213. As stated in the Advisory Committee Notes to said rule: “ Subdivision (b) requires the decision to state only the facts deemed essential, which may be done by granting requests for findings or by embodying them in the decision. Therefore, requests need not be passed upon.” (Second Preliminary Report of Advisory Comm, on Practice and Procedure, 1958, p. 241.) .In the unreported decision of County Aggregates v. State of New York (Claim No. 38794 [1965], affd. 26 A D 2d 844) Justice A. David Benjamin stated: “ The need for passing upon these multiple findings could have been obviated by a simple decision of the Court, supported by a full explanation of the rationale of such decision * * *. The conflicts and confusion which spring from placing these proposed adversary findings in juxtaposition, and in dealing with the semantics of each of them rather than with the basic problems of the case, are an unhappy waste of judicial time, wholly unsupportable by common sense and logic, and calculated to lead to entrapment and obfuscation rather than to enlightenment.” (See Record on Appeal, p. 27.)
The hospital record maintained by the State for claimant Whitree was about as inadequate a record as we have ever examined. We find that said record did not conform to the standards in the community; and, that the inadequacies in this record militated against proper and competent psychiatric and ordinary medical care being given this claimant during his stay at Matteawan State Hospital. We further find that the lack of psychiatric care was the primary reason for the inordinate length of this incarceration, with the concomitant side effects of physical injury, moral degradation, and mental anguish. Therefore, to the extent that a hospital record develops information for subsequent treatment, it contributed to the inadequate treatment this claimant received. Claimant’s expert doctor testified as to the inadequacies in this record. However, in our opinion, it was so inadequate that even a layman could determine that fact. (See Hammer v. Rosen, 7 N Y 2d 376, 380; Benson v. Dean, 232 N. Y. 52, 56.)
The hospital record disclosed that Whitree was committed on May 19, 1947, on the strength of the court order of commitment and the Bellevue Hospital psychiatric examination which presented a diagnosis of ‘ ‘ Paranoid Condition in a Chronic Alcoholic.” It is of interest to note that none of claimant’s medical examinations disclosed any objective physical or physiological findings which could substantiate the diagnosis, chronic alcoholic. He was briefly and routinely examined by a staff physician on the admission date.
*702 On May 20, 1947, he received a full psychiatric examination and on May 26, 1947, a routine psychiatric examination. On June 2, 1947, he was transferred from the admission ward to Ward B, a quiet ward. On September 9, 1947, another psychiatric examination was conducted and on September 10, 1947, Whitree was presented at a diagnostic staff conference of hospital psychiatrists. This, incidentally, was the only diagnostic staff meeting to which Whitree was presented during his entire stay at the hospital. He was diagnosed as the result of these psychiatric examinations as, “ Psychosis With Psychopathic Personality, Paranoid Trends.”
The next psychiatric note, if that is what it was, was dated April 12,1948 and was the reproduction of a letter that Whitree had written to a Captain Sheppard. This note was signed by a Dr. Procter, who is no longer employed by the State, but no statement was set forth as to any psychiatric conclusions referable to said letter. On July 17, 1948, Whitree was transferred to Ward 7, a quiet ward.
On October 5, 1948, he received a psychiatric examination by a Dr. Wolff who wrote down his thoughts referable to Whitree’s mental situation. On December 7,1949, Whitree was transferred to Ward 9, an essentially open ward for more difficult patients. There was nothing in the record to indicate why he was transferred from a quiet ward. We believe we should note at this point that Whitree was placed on probation by the Court of General Sessions on December 6, 1946. He was advised by his probation officer that said probation would last for a three-year period; or, roughly until December 6, 1949. Such advice as to the potential length of the probation was consonant with the provisions of section 933 of the Code of Criminal Procedure. There is absolutely no question that Whitree thought his punishment was for a three-year period. See, Exhibits “ 29,” “ 31,” “ 32,” “ 35,” “ 36,” and “43.” When one considers Whitree’s background, his limited education, the fact that he had had prior difficulties with the law and his general experience, it does not seem too bizarre a possibility that he caused no trouble in the hospital while, in his mind, he was being legitimately punished. However, when such period was over, he was transferred for some reason, if there was a reason, from a quiet ward to a difficult ward.
In the period May 19, 1947 through October 5, 1948, Whitree was psychiatrically examined on five occasions, of which four such examinations took place in the first four months. It is possible he was psychiatrically noted by a Dr. Willner, now deceased, during this period and into the early 1950’s. However, *703 Dr. Johnston stated on examination before trial that “ Dr. Willner, he had his own way of doing things which I am sure was endorsed by the administration. Maybe a little different than mine.” Apparently, Dr. Willner’s method of doing things did not include making notes in the hospital record. It is this careless administrative medical procedure that, in our opinion, militates against adequate medical care. We must find that the claimant was not psychiatrically examined by Dr. Willner. The next psychiatric note, which was brief and unsigned, was dated January 19, 1950, almost 15 months after the October, 1948 examination. The next psychiatric note was dated April 22, 1953, almost 3 years and 3 months after the prior examination.
It is of interest to note that in 1950 (L. 1950, ch. 525) the Legislature provided that in crimes involving sex offenders there could be a resort to psychiatric treatment with an eye to the possibility of rehabilitation and release of such prisoners in a proper case. Such treatment was to be afforded these prisoners in the penal institutions. As stated in People v. Jackson (20 A D 2d 170, 172): “ As an essential concomitant to this type of sentence, however, this recommendation was made * * * ‘ We recommend further that, whenever an offender shall be sentenced to such a term of from one day to life, the law shall impose * * * the solemn duty of giving his case prompt and intensive study, to be followed where feasible by therapeutic treatment, to the end that such offender may be rehabilitated and released whenever it may appear that he is a good risk on parole. When serving under this form of sentence, it should be required that a prisoner receive thorough psychiatric examination not less than once every tivo years ’ ”. (Emphasis added.) Also, as stated in People ex rel. Kaganovitch v. Wilkins (23 A D 2d 178, 183): “ Adequate psychological and psychiatric services are indispensable to the whole concept of ‘ one day to life ’ sentences and without them the ‘ one day ’ is meaningless and ‘ the life ’ may well be the end result.” (See, also, People ex rel. Chumley v. Mancusi, 26 A D 2d 905; People ex rel. Piatt v. La Vallee, 26 A D 2d 904; People v. Whitney, 28 A D 2d 806.)
The obvious question that presents itself from a consideration of the above cases is, are we to be more concerned with the treatment afforded prisoners who have been found guilty than with the treatment afforded those who have not as yet been found guilty and who, under our jurisprudence, are presumed innocent until so found? The answer must be a resounding no. Obviously, a man who has been psychiatrically examined 7 times in 6 years, of which only 3 examinations were of *704 any depth and those in the first 4 months of this 6 year period, has not been afforded adequate psychiatric care at Matteawan State Hospital.
After April, 1953, Whitree was psychiatrically examined on March 11, 1954, by a Dr. Nelson who stated: “ In relating the story leading to his hospitalization, there is no essential change from previous examinations, his delusions appear very fixed. No hallucinations were elicited. Intellectual functions appear in tact [sic], and there is no evidence of personality deterioration. ’ ’
He was next psychiatrically noted on October 5, 1954, prior to his application for a writ of habeas corpus dated October 31, 1954; and, on November 13, 1954, prior to his hearing on December 3, 1954. This writ was denied on December 20, 1954, and Whitree was transferred to another ward (15) on January 13, 1955. He was psychiatrically noted on August 5, 1955, and an application for a writ was made on August 21, 1955. It was of interest to observe that, in the note of August 5, 1955, which primarily related to an altercation between Whitree and two other patients, it was stated “ he was placed in a camisole for one day.” This statement does not square with the examination before trial of Attendant Ferrone, wherein Ferrone stated: “ Oh, we have a standing order that a man stays in the camisole not over, I think, two or three hours ”, On November 2, 1955, there is a note in the hospital record relating to Whitree medically. This note is so illustrative of the inadequacies of the hospital record and medical treatment that it is reproduced in full herein:
“ November 2, 1955: He was sent visiting to Ward 2 at 6:30 A. M. because he was found unconscious in his bed. Physical examination showed T. 99.2, P. regular and strong B. P. 70/50, both pupils regular and contracted, left knee plantar reflexes decreased. Blood sugar 99.3%. Blood BBC 3,700,000. Hge: 78%. S.B. 18. Hem. 38. Patient remained unconscious until noon. His pupils then showed reaction to light and the sluggish left side reflexes disappeared. On November 3rd this patient apparently regained consciousness but he did not react to questioning. On November 7th, patient remained very uncooperative, used profane language to the doctors and attendants, and he claimed he was poisoned and physically abused.” (Emphasis added.)
“ November 8, 1955: This patient improved under treatment and is being returned to his own ward today.”
One might fairly ask, what treatment? Were X rays taken, were fluids induced, how often were pulse and respiration taken, *705 were drugs given, how long was this patient unconscious, 5% hours or 24 hours, what was done for him on the 2d, 3d, 4th, 5th, 6th, 7th, and 8th days of November, 1955? Such a record substantiates claimant’s position that he was not given adequate medical care while in Matteawan State Hospital. (See Zophy v. State of New York, 27 A D 2d 414.) We might state here that Exhibit “ 15 ”, the prescription record for Whitree during his stay in the hospital sets forth the fact that he received vaseline and rectal suppositories during his 14% years. There was no indication of medication from November 2 to 8, 1955. On November 22, 1955, there is a psychiatric note again adverse to Whitree in the hospital record. The time differential is too obvious to belabor.
On December 4,1955, according to the hospital record, Whitree became abusive and was placed in a camisole. On December 5, there is a psychiatric note adverse to Whitree and he was given a “ physical examination ” which did not reveal signs of injury. On December 7, because Whitree refused to eat, the hospital commenced tube feeding. Subsequently on the night of December 7, Whitree commenced to bleed rectally and the note stated “ Examination revealed large inflamed piles with rectal prolapse.” The physical examination on December 5 must have been as thorough as the other medical treatment afforded this man. On December 9, 1955, we find in the record ‘' His rectal bleeding has almost discontinued. He has changed his hostile and negativistic attitude towards the attendants and started to eat normally.” On December 19, 1955, he was discharged from the medical ward as he had stopped bleeding. On December 28, 1955, there is a psychiatric note, again adverse, and which also states: ‘ ‘ He continues to feel that he is being abused at this hospital.” We find this to be a reasonable belief. Further, we find a psychiatric examination in such close proximity to this traumatic set of circumstances to be of very questionable medical value; and, the fact that the note in the record does not appear to appreciate this fact casts grave doubts on this doctor’s competency. On January 3, 1956, he was presented on a writ of habeas corpus which was adjourned.
On January 29, Whitree assaulted another patient, one he had complained about over the prior years. Whitree was then transferred to Ward 4, a seclusion ward, where he remained until January 27, 1960, when he was transferred to Ward 3, another seclusion ward, where he remained until May 11, 1960, when he was transferred back into Ward 9. Thus, he was placed in maximum security for over four years. In these *706 wards each patient was kept in a locked cell except for exercise and toilet requirements. There are several psychiatric notes in the record during the period January 29, 1956- until his discharge on September 8, 1961. Almost every one of these notes can be closely related in point of time to applications for a writ of habeas corpus or hearings on such writs."
On March 7, 1961, the hospital Superintendent certified that Whitree was “ in such a state of insanity, idiocy, or imbecility as to be unable to understand the nature of the charge pending against him and to make his defense thereto.” On May 25, the psychiatric note in the record was similar to all prior notes. On September 8, 1961 he was discharged from the hospital as “ Psychosis with Psychopathic Personality, Paranoid Trends. Condition on Discharge: Improved.” We consider the final diagnosis and the use of the word ‘ ‘ Improved ’ ’ the epitome of cynicism and a symbol in one word of the medical and psychiatric nontreatment received by this man over the greater part of 14% years. Granted the State has appropriated large sums of money to provide mental hospitals and care for the mentally ill and that said hospitals are under tremendous pressure. (See People ex rel. Rogers v. Stanley, 17 N Y 2d 256, 259 et seq.) However, as stated in Pisacano v. State of New York (8 A D 2d 335, 340):
“ Prison physicians owe no less duty to prisoners who must accept their care, than do private physicians to their patients who are free to choose. A similar sentiment was expressed in the much-cited case of Spicer v. Williamson (191 N. C. 487) * * * ‘ The prisoner by his arrest is deprived of his liberty for the protection of the public; it is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself. ’ ”
On September 25,1961, after a thorough and complete psychiatric examination at Bellevue Hospital, Whitree was diagnosed as ‘ ‘ Schizoid Personality with Paranoid Features ’ ’ and further that ‘ ‘ He is not in such a state of idiocy, imbecility or insanity as to be incapable of understanding the charge, indictment, proceedings or of making his defense.” One, of course, must realize that sanity is an area and not a point on a line. This diagnosis was one that fit within socially acceptable behavior, albeit one that most would prefer not to have. It is our opinion, and we so find, that if this man had received proper and adequate psychiatric treatment such diagnosis would have been developed much sooner; and, Whitree would have been released from Matteawan State Hospital much sooner. Claimant’s *707 expert gave 1is the opinion of three to six months after admission. With the pressure of work and the problems of staffing inherent in the operation of State hospitals, avc find that opinion to be too sanguine. Admittedly, for the court to develop such a date is arbitrary, however, we have no other recourse. We find that proper and adequate psychiatric treatment consonant with community standards would have developed no later than May 19, 1949, cither that this man had at the best no psychiatric problems as testified to by his expert; or, at the worst a diagnosis similar to that developed at Bellevue in 1961. We find that he should have been released from Matteawan State Hospital no later than May 19,1949.
If we accepted the State’s diagnosis, which we do not, we find that, with community stand many years ear psychiatric and medical care consonant with ards, this claimant would have been released lier than he was. We find that he was not treated" with any of the modern tranquilizing drags or any of their less-effective.antecedents during his entire stay in the hospital. It was not Until 1959 that such drugs were prescribed. We find that the reason for not using such drugs was that Whitree refused them. We consider such reason to be illogical, unprofessional and not consonant with prevailing medical standards. We find that Whitree was never exposed to psychotherapy or to psychological testing during his time in the hospital. We find that, if the State doctors had ever looked into the primary reason for their believing this man was subject to delusions of persecution and a lack of insight, their diagnosis would have changed with a resulting release of the patient. This lack of effort was not consonant with medical standards in the community. We realize that State doctors are not required to look behind the committing papers proper on their face and that “ it was not the function of the State’s' agents to explore these procedural steps upon which the order of a court of competent jurisdiction proceeded ”. (Whitree v. State of New York, 26 A I) 2d 720, 721.) The State, therefore, cannot be held liable for the initial commitment. However, when medically considering the patient the State must be held liable for Uot investigating that which would have developed a different diagnosis.
The cases of Taig v. State of New York (19 A D 2d 182); Higgins v. State of New York (24 A D 2d 147); St. George v. State of New York (283 App. Div. 245, affd. 308 N. Y. 681) and Dennison v. State of New York (28 A D 2d 608) stand for the principle, among others, that errors of professional medi *708 cal judgment do not “ cast liability upon the State.” The State contends, without conceding, that the most we are concerned with, in this claim, were errors of professional medical judgment. We disagree. It was well stated in Stone v. Goodman (241 App. Div. 290, 295) that: “ The rule requiring a physician and surgeon to use his best judgment does not make him liable for a mere error of judgment, provided he does what he thinks is the best after careful examination.” (Emphasis added.) Careful examination was totally lacking over this 143/2 year period. We find that no competent professional judgment was made. We find only custodial judgment. In fact, the trial record developed clearly and coldly that the claimant received only custodial care during the greater part of said confinement; and that, in part, said custodial care was brutal and callous. The record is, in fact, redolent with callous contempt for the claimant herein.
“ The damages recoverable in malpractice are for personal injuries, including the pain and suffering which naturally flow from the tortious act.” (Robins v. Finestone, 308 N. Y. 543, 546.) The injuries which flow from the malpractice herein are false imprisonment from May 19, 1949 to September 8, 1961, almost 12 years and 4 months; the moral and mental degradation implicit in such confinement; the pain and suffering caused by attacks and beatings from patients and guards at the hospital; the physical injuries sustained during this period; and, the loss of earnings over said period of incarceration which, of course, must be considered in light of the possibility that the Court of General Sessions might have confined Whitree to prison if he had been released to said court in 1949.
The State took the position that we could not give any weight to the testimony of Whitree and Butler, his only lay witness. Mr. Butler had been a patient during a large part of Whitree’s confinement and was out on habeas corpus with a claim pending against the State during the time of this trial. We realize that both Whitree’s and Butler’s testimony became at times confused, particularly as to dates; and, hostile, particularly Butler. However, these factors went to the weight of their testimony. There was a ring of truth to much of this testimony, as incredible as some of their statements appear to a noninmate, particularly when one also examines the various exhibits received in evidence. For example, Whitree stated that after a beating administered by the attendants, he was stripped and placed in the “ Blue Room.” That said room was a small dark room without toilet facilities, without water facilities, and, without a bed or mattress. He stated he was kept in said room for *709 about eight days on bread and water plus a full meal once every three days. This sounds incredible but it was not refuted by any State witness. (Cf. Wright v. McMann, 387 F. 2d 519, 521, 522.)
We note that the State rested at the completion of claimant’s case and did not present any direct case except for medical proof from an orthopedic surgeon engaged by the State for this trial; and, except for the examinations before trial of two State doctors and two attendants which were offered in evidence by the claimant. The receipt of these examinations before trial made these persons, who were all available to testify, witnesses. Much, of course, of Whitree’s and Butler’s testimony was not treated with in the examinations before trial. We also note that Dr. Lacavarra, Dr. Pietnchon, also known as Dr. Pitt, Dr. Friedman, and Dr. Lanzkron were still employed by the State at the date of trial. None of these gentlemen was called to testify at the trial. We further note that attendants Rocky Smith, Dominick La Blocco, and William McCarrow were at all relevant times employees of the State and were such employees at the time of trial. None of these gentlemen was called to testify at the trial. The failure of the State to call these employees as witnesses certainly warrants the inference that their testimony would not have substantially contradicted the testimony of Butler and Whitree. (Noce v. Kaufman, 2 N Y 2d 347, 353; Laffin v. Ryan, 4 A D 2d 21, 26, 27; 1 Mottla, New York Evidence, [2d ed.], § 60.)
It appeared quite obvious from the examinations before trial of the two attendants, Pettit and Ferrone, that attendants received an absolute minimum of training in the proper handling of patients with psychiatric problems. We have no doubts that these gentlemen could handle their patients from a custodial and physical point of view and we do not envy their very difficult work. However, the fact still remains that this was supposed to be a hospital. We find an answer made by one of these attendants in his examination before trial to be revealing.
“ A. They are irritable, eighty per cent of my fights, or trouble is at 6:30 in the morning.
‘ ‘ If there is a movie coming on, or if there is a good meal — I don’t know if I should say this — but they are like an animal, they know when to be fed, they are like dogs wagging their tail. ’ ’
The State correctly takes the position that it is not an insurer of the safety of the patients in its mental hospitals. (Root v. State of New York, 180 Misc. 205, 208.) It also correctly states that it is not necessarily liable merely because of a sudden assault by one patient upon another. (Blitzer v. State of New York, 16 A D 2d 191, 193, affd. without opn. 13 N Y 2d 637.)
*710 However, these cases are not applicable to the claim herein. Hi those cases, the courts were treating with the problems of patients legitimately in the State hospital. In this claim, we are treating with injuries inflicted upon a man who was in the hospital from May 19, 1949 to September 8, 1961, only because of the negligence of the State’s employees. We find, of course, that Whitree was not contributorily negligent.
Beside the injuries mentioned above, Whitree sustained other injuries during his incarceration. We note that when Whitree was admitted to the State hospital he was about 48 years of age and in good physical health, although he had sustained a slight knee injury while in the Armed Forces. On April 5, 1955, another patient poured hot coffee over him causing first degree burns to his face and chest. On March 4, 1961, he was kicked in the face by another patient causing a fracture to 2 upper incisors, 4 lower incisors to loosen, a fracture of the nose, and a laceration requiring 4 sutures to close. On several occasions, while Whitree was sleeping, he was struck by other patients and his testicles were squeezed. He was struck, kicked, and beaten by attendants. The headaches which Whitree has had through the years since November, 1955, and up to the time of trial, were causally related to the injuries reflected by his hospitalization of November 2, 1955. On or about September 5, 1950, Whitree sustained a complete fracture of the second metacarpal bone of the left hand which healed with deformity. He sustained a comminuted fracture of the distal end of the right tibia which healed with deformity. He sustained a fracture of the greater tuberosity of the right shoulder which healed with deformity. He sustained fractures of the eighth and ninth ribs posteriorly on the left side. He sustained an injury in the area of the fifth and sixth cervical vertebrae which resulted in a deformity and compression of the bodies of said vertebrae. That, as a consequence of said injury, he developed an osteoarthritic condition in that area of the cervical spine. As a consequence of the beatings administered to Whitree while a patient during the 12-year preiod aforesaid, he sustained a permanent and chronic peritonitis of the right shoulder.
Whitree’s earnings prior to his commitment were sporadic. Claimant proved by written record only meager earnings. However, we accept that he earned more than was indicated by the written record, although we do not accept the extent of the earnings testified to by the claimant.
We reserved decision on the State’s motions to dismiss this claim. We now deny said motions.
*711 We believe we understand the immense difficulties faced by the State in financing, staffing, and administering as vast a complex as Matteawan State Hospital, as well as the other State hospitals. However, society denominates these institutions as hospitals and they should be so conducted. If they are to be no more than pens into which we are to sweep that which is offensive to ‘ ‘ normal society ’ ’ then let us be honest and denominate them as such. Certainly, as we demean the least of us, so we demean us all. As stated by Dr. Meyen on page 16 of Exhibit “ 17 ”: “ Because one thing is to remove them from the environment that has provoked originally the paranoid feeling, and paranoid ideas, paranoid reactions of these people, to put them in an environment that is understanding, that is emotionally supportive to give them the opportunity, so any time there is some tendency to start self-evaluation, to discuss it, there are other members of the medical team on hand, who would, at any time, with understanding, without provoking, without irritating them, to bring out their grievances, interview them and help the patient gain some insight.” This is what Matteawan State Hospital should have been. The record clearly discloses that this is what it was not. (See, also, People ex rel. Brown v. Johnston, 9 N Y 2d 482, 485.)
We award the claimant herein the sum of $300,000 for all damages, as set forth above, incurred during the period May 19,1949 through September 8,1961.