CHARLES C. BARTLETT, Appellant-Respondent, v STATE OF NEW YORK, Respondent-Appellant. (Claim No. 53290.)

Fourth Department, May 28, 1976

*Samuel H. Greene (Irwin Birnbaum* and *Robert E. Lahm* of counsel), for appellant-respondent.

*Louis J. Lefkowitz, Attorney-General (Jeremiah Jochnowitz* and *Ruth Kessler Toch* of counsel), for respondent-appellant.

WITMER, J. Charles C. Bartlett, claimant, appeals from a judgment of the Court of Claims dismissing his claim against the State after trial. The claim is for damages suffered by him by reason of the alleged wrongful acts of the State's agents in "unlawfully admitting and detaining" him in Willard State Hospital "and for an invasion of claimant's personal, civil and constitutional rights, and also for damages for claimant's mental and physical suffering as a result therefrom". We conclude that the court erred in dismissing the claim.

The basis of the claim is that on January 30, 1932 claimant, unmarried, 30 years of age and residing in Waterloo, New York, was involuntarily committed to Willard State Hospital without notice of the legal proceedings and was detained there against his will and protestations for 37 years until his release on January 15, 1969. It appears that for a few years prior to

1929 claimant was a tool grinder in a machine shop but lost his job when the financial depression struck that year. He then became dull and seclusive. On January 28, 1932 his mother and sister took him to Willard State Hospital at the suggestion of the family physician. On learning that under a voluntary commitment to the hospital claimant could leave at will, his mother asked that he be examined for involuntary commitment, stating that his mental condition was such that he should receive care and treatment over an indefinite period. On that day, therefore, claimant was examined by two doctors at the hospital who found that his physical condition was good. In their report they set forth his history, to wit, that during the preceding four years he had been "dull, indifferent, could not sleep, did not work. Did not want to meet strangers, was seclusive and spent considerable time in his room"; and they found that he was then "dull and indifferent to his condition and surrounding; admits he has been seclusive" and "can't sleep nights". They concluded that, "in our opinion the patient has the following dangerous tendencies: Aimless wandering". They expressed the opinion that personal service of the papers on claimant for an involuntary commitment to Willard State Hospital would be detrimental to him because, "Not advisable". It is noted, however, that the hospital records of a doctor questioning claimant on March 10, 1932 show that he was alert and responded intelligently.

Based upon the certification by the two examining doctors, the County Judge of Seneca County on January 30, 1932 dispensed with service on claimant of the papers in the proceeding for his involuntary commitment in Willard State Hospital, adjudged him to be insane, ordered his commitment to that hospital and ordered that papers in the proceeding be delivered to the Seneca County Clerk and be sealed and exhibited to no one except on order of the court. His condition was diagnosed as "simple or low level schizophrenia".

Under that commitment claimant remained at Willard State Hospital for 37 years until January, 1969 when by virtue of the amended provisions of article 5 of the Mental Hygiene Law the director of the hospital petitioned for authority to continue his commitment there for another year. A hearing was held before the Seneca County Judge, following which the court ordered claimant released to outpatient care as not dangerous to himself or the community. In due time claimant then instituted this proceeding for damages for his

wrongful detention. The claim rests principally upon the assertion of neglect of claimant, his right to be released and the failure of the State to release him despite his insistent requests.

In the 37 years of claimant's commitment at the hospital only 72 entries were made in his medical record, 47 of which reflected personal contact with physicians and 25 consisted of administrative notes, including transfers from one ward or building to another. During the first 25 years of his commitment he was not permitted outside of the locked hospital buildings except on supervised walking parties. For years he received no treatment beyond an occasional interview with a hospital doctor. Doctor Franklin Reed, Assistant Professor of Psychiatry at the Upstate Medical Center, testified as claimant's expert, after reviewing claimant's records at the hospital. He did not question the propriety of the State's action in having claimant involuntarily committed; but he concluded that the records show that claimant was given inadequate psychiatric examinations, even according to the standards then prevailing, and inadequate medical treatment, and that in view of his intelligent responses to questions and his general docile nature and conduct, he should have been released as an outpatient soon after his commitment. Dr. Reed testified that a plan of treatment of claimant should have been formulated within a reasonable time after his commitment and that in any event claimant should have had periodic complete re-examinations. He noted that there is no record of such examinations and that the record shows that no plan for claimant's treatment was ever devised. He expressed the opinion that the failure to advise claimant that he had been involuntarily committed under court order gave claimant a reason to be frustrated and to believe that he was illegally detained.

The director of Willard State Hospital testified that although tranquilizers became available in the 1950's, claimant did not need that treatment; nor did he need insulin treatment, because his condition was not that severe, neither did he need electric shock treatment. It may fairly be inferred from the record that claimant's condition was such that no treatment was needed; and indeed the director testified that for years no treatment other than an occasional conference with a doctor was needed or tendered. The director agreed that prior to 1962 there was no treatment planned for claim-

ant. It was only after the enactment of the amendment of the Mental Hygiene Law (art 5) in the 1960's, after which the hospital needed claimant's consent or a court order to continue to retain him, and claimant refused to consent, that in 1968 claimant was given tranquilizer treatments, and court application was made for his retention, as above stated. In 1962 the director did write to claimant's sister, suggesting that claimant be released to her on home visits, but her husband replied that when claimant was originally committed he, the husband, had been advised by the doctors "that he (claimant) probably would not improve to the extent that it would ever be safe for him to reside in a private home"; and he demurred to the suggestion of receiving claimant. The director did nothing to remove this thought from the minds of the sister and her husband and did not pursue the matter of claimant's release for home visits.

Claimant's mother resided in Washington, D.C. Although she saw him occasionally until 1955, and his sister visited him occasionally, it appears that they were happy to have him retained at the hospital; and although claimant consistently sought his release, they gave him no help to that end.

That situation may have contributed to the hospital's lack of interest in releasing claimant as an outpatient or otherwise; but it did not relieve the hospital authorities of their responsibility to release him when he was mentally ready therefor. The hospital records, meager as they are, confirm Dr. Reed's testimony that for years claimant was mentally ready for release, at least as an outpatient, and that he would not be dangerous to himself or to the community. The records also confirm claimant's testimony that for years he repeatedly advised the hospital that he was being improperly detained, and he even warned the hospital authorities that he would hold them responsible for his improper detention. Nevertheless, the hospital gave no thought to his release.

After the amendment of article 5 of the Mental Hygiene Law became effective, pursuant to section 73 thereof the director of the hospital petitioned Seneca County Court for authorization to continue to retain claimant for another year. Upon that application the court conducted a hearing, following which it ordered claimant's release to outpatient care because the court found him not dangerous to himself or to the community. That action by the court is not before us for review, but we observe that the hospital records and the

evidence in this case fully support the order. It is also noteworthy that it has not been intimated that since his release claimant has not adjusted suitably to life in the community.

There is no basis for a claim against the State on the ground that claimant was improperly committed. The record shows that it was proper for the State to commit claimant in January, 1932 because of his mental condition, and the State is not liable in any way by reason of his original commitment (*Douglas v State of New York,* 296 NY 530; *Rosario v State of New York,* 33 AD2d 122, affd 36 NY2d 901; *Whitree v State of New York,* 26 AD2d 720; *Whitree v State of New York,* 56 Misc 2d 693, 707).

The question for our determination is whether the conduct of the Willard State Hospital authorities with respect to the treatment and detention of claimant for any period of time following his commitment was wrongful and hence actionable.

In *Jackson v Indiana* (406 US 715, 738) the court said, "due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed". See also, to like effect, *McNeil v Director, Patuxent Inst.* (407 US 245, 250). We recognize, of course, that insofar as the State, through its agents, exercised accepted administrative and professional judgment, it may not be held responsible to claimant in negligence or for illegal detention (see *Weiss v Fote,* 7 NY2d 579); *Young v State of New York,* 40 AD2d 730, mot for lv to app den 31 NY2d 646; *Bellows v State of New York,* 37 AD2d 342, 344). Where, however, it is shown that through negligent inattention to duty the State agents have caused harm to a person under the State's control, more than a question of professional judgment is presented and the State may be found liable for its negligent conduct (*Zophy v State of New York,* 27 AD2d 414). Here, the record shows an almost total lack of attention to claimant as a patient, and it appears that for many, many years he was entitled to be released, at least as an outpatient, and to resume some semblance of freedom in the community. The wrong committed by refusing such release is not the result of the exercise of a professional judgment, but of a total indifference and neglect of attention to duty. Such conduct removes the protection of governmental immunity (see *Zophy v State of New York, supra).* In *Rouse v Cameron* (373 F2d 451, 456-457) Chief Judge BAZELON wrote: "According to leading experts 'psychiatric care and treatment' includes not only the

contacts with psychiatrists but also activities and contacts with the hospital staff designed to cure or improve the patient. The hospital need not show that the treatment will cure or improve him but only that there is bona fide effort to do so. *This requires the hospital to show that* initial and *periodic inquiries are made into the needs and conditions of the patient with a view to providing suitable treatment for him, and that the program provided is suited to his particular needs.* Treatment that has therapeutic value for some may not have such value for others. For example, it may not be assumed that confinement in a hospital is beneficial 'environmental therapy' for all.

"The effort should be to provide treatment which is adequate in light of present knowledge. Some measures which have therapeutic value for the particular patient may be too insubstantial in comparison with what is available. On the other hand, the possibility of better treatment does not necessarily prove that the one provided is unsuitable or inadequate." (Emphasis added.)

Thus, although there may not be complete unanimity of opinion as to what treatment to extend to a patient, there can be no doubt that if the patient is detained because of mental illness, some planned treatment must be afforded to him.

It is not a matter of second guessing the State's doctors and administrators with respect to their judgment of the proper treatment for a patient, for as to that the courts should make no judgment. That is not to say, however, that the courts should not intervene when there is a negligent failure to act (see *Rouse v Cameron, supra,* p 457, where the court said in effect that the fact that the treatment of a mental patient is not an exact science "cannot relieve the court of its duty to render an informed decision"). In *O'Connor v Donaldson* (422 US 563, 573-576) Mr. Justice STEWART wrote:

"The jury found that Donaldson was neither dangerous to himself nor dangerous to others, and also found that, if mentally ill, Donaldson had not received treatment. That verdict, based on abundant evidence, makes the issue before the Court a narrow one. * * *

"Given the jury's findings, what was left as justification for keeping Donaldson in continued confinement? The fact that state law may have authorized confinement of the harmless mentally ill does not itself establish a constitutionally adequate purpose for the confinement. [Citations omitted.] Nor is

it enough that Donaldson's original confinement was found upon a constitutionally adequate basis, if in fact it was, because even if his involuntary confinement was initially permissible, it could not constitutionally continue after that basis no longer existed. [Citations omitted.]

"A finding of 'mental illness' alone cannot justify a State's locking a person up against his will and keeping him indefinitely in simple custodial confinement. Assuming that that term can be given a reasonably precise content and that the 'mentally ill' can be identified with reasonable accuracy, there is still no constitutional basis for confining such persons involuntarily if they are dangerous to no one and can live safely in freedom. * * *

"May the State fence in the harmless mentally ill solely to save its citizens from exposure to those whose ways are different? One might as well ask if the State, to avoid public unease, could incarcerate all who are physically unattractive or socially eccentric. Mere public intolerance or animosity cannot constitutionally justify the deprivation of a person's physical liberty. [Citations omitted.]

"In short, a State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends."

In concurring, Chief Justice BURGER wrote (p 580), "There can be no doubt that involuntary commitment to a mental hospital * * * is a deprivation of liberty which the State cannot accomplish without due process of law * * *. Equally important, confinement must cease when those reasons [for confinement] no longer exist."

The foregoing principles define the standard to be applied in this case and clearly establish claimant's cause of action.

The judgment dismissing the claim must, therefore, be reversed, the claim reinstated and remitted to the Court of Claims for assessment of damages, as to which the court should consider the length of time that claimant was able and ready for release, as an outpatient or otherwise, without danger to himself or to the community, and the ability of the State to release claimant in view of the unavailability of relatives to look after him; and the award should recompense claimant for the deprivation imposed upon him by the State of the freedom of living in the community when he was mentally able to do so, and for the mental and physical suffering which

the evidence adduced may show that claimant endured while entitled to be at liberty.

MOULE, J. P. (dissenting). Inasmuch as claimant has failed to sustain the burden of proof on his cause of action I dissent and vote to affirm its dismissal.

The majority correctly points out that "insofar as the State, through its agents, exercised accepted administrative and professional judgment, it may not be held responsible to claimant in negligence or for illegal detention." Thus the State becomes liable for its actions only when it is established that through negligent inattention to duty the State's agents have caused harm to a person under the State's control. In my opinion, the evidence presented here does not meet this burden of establishing such "negligent inattention to duty."

In support of his cause of action, claimant offered the testimony of two psychiatrists, neither of whom had examined or interviewed claimant prior to trial. Their testimony, therefore, was based solely upon general medical knowledge and a review of claimant's medical records. The first witness was a staff psychiatrist at Willard State Hospital. He admitted that at the time of claimant's original voluntary admission in 1932 the only available and recognized treatment for dementia praecox simple was conversations with a psychiatrist but that such conversations, while in effect a form of therapy, need not be noted in the patient's medical records. He also admitted that claimant's mere presence within the milieu of a hospital would contribute toward the treatment of his illness.

According to this witness, while more conventional therapies were developed in the 1930's, these treatments, consisting of electro-convulsive shock, insulin and carbon dioxide narcosis, were reserved for only the seriously disturbed patients due to the inherent dangers involved in their administration. It was not until 1955 that the first benign chemical treatments such as tranquilizers were developed.

Claimant's second medical expert was an assistant professor of psychiatry at the Upstate Medical Center. Based upon his review of the medical records, he opined that aside from claimant's first examination upon admission, there was a marked absence of adequate mental and physical examinations as well as ongoing medical treatment until 1968-69 when claimant was given tranquilizers. Although he admitted that the mere absence of notations in the medical records did not

necessarily mean that claimant did not receive treatment, this absence when coupled with the lack of continuing medication was significant. He admitted, however, that he could not state when either the diagnosis of claimant's illness or his confinement in the hospital became improper.

In analyzing the sufficiency of this proof, it is important to note that due to the doctrine of governmental immunity negligent professional judgments by the State are not actionable (see *Bellows v State of New York,* 37 AD2d 342; *Zophy v State of New York,* 27 AD2d 414; *Rosario v State of New York,* 33 AD2d 122, affd 36 NY2d 901). Thus, as long as the State provides the patient with ongoing medical treatment, its decision to employ one type of accepted therapy as opposed to another will not give rise to a cause of action. In light of this, claimant was required to establish that the State, either in fact or in effect, negligently failed to provide him with any adequate medical treatment.

Turning then to the allegations of negligence raised here, claimant's experts take issue with five basic aspects of the State's treatment. These are the lack of prescribed medication, the absence of an ongoing treatment plan, the sparsity of adequte entries in the medical records, the failure to allow claimant out on weekends, and the failure to investigate adequately claimant's family relationship.

With respect to the argument that the State failed to prescribe proper medication, it is undisputed in the record that, although claimant received phenobarbital in 1959, he was not given a major tranquilizer until 1968. However, the use of such drugs in cases like this was not, according to claimant's own experts, recognized until 1955. With respect to the period between 1955 and 1968 claimant has failed to present any evidence to establish that he was amenable to this type of treatment. In fact, the uncontradicted testimony of the director of the State Hospital pointed out that during this period the use of tranquilizers was "not indicated" in claimant's case. The mere existence of a certain type of treatment or therapy does not necessarily mean that it should be indiscriminately prescribed in every case and, in light of the State's evidence on this point, it was incumbent upon claimant to establish that his condition warranted the use of such tranquilizers.

Nor is there any indication that claimant was not afforded an ongoing treatment plan. While it is true that the medical

records do not establish that claimant received complete mental and physical examinations on a yearly basis, there are numerous psychiatric evaluations entered by doctors with whom claimant conversed. Inasmuch as such conversations are admittedly a form of therapy in a case such as this, it cannot be said that on the record before this court claimant has established the lack of an effective treatment plan. Furthermore, the hospital made available group occupational therapy programs. However, except for limited instances, claimant refused to participate in these programs and, in fact, exhibited a hostile attitude toward them.

Claimant also takes issue with the sparsity of the entries in the medical reports. However, as his own experts admitted, that fact alone does not establish that the State failed to provide the proper treatment in this case. While it may be taken as evidence of such failure, it cannot be said to establish such fact, as against the other evidence in the case, by a preponderance of proof. Furthermore, there was no evidence that claimant required more extensive or more frequent examinations than those given.

Claimant's fourth contention, that he should have been permitted out on weekends, is readily disposed of by reference to the fact that one of the symptoms mentioned in claimant's original diagnosis was "aimless wandering" and that, according to the medical reports, claimant consistently exhibited a hostile and non-co-operative attitude. Thus there was a basis for refusing to permit him to go out on weekends. The propriety of this judgment cannot be viewed in retrospect but must be evaluated in light of the patient's attitude and condition at the time. Thus while such weekend releases may be considered an accepted form of treatment, there is no indication that claimant was amenable to this therapy and, in any event, it was a matter of professional judgment for which the State cannot be held liable.

Finally, it is argued that the hospital negligently failed to investigate claimant's family relationship. It is important to note, however, that claimant's mother and sister were responsible for his subsequent involuntary commitment and that, as the majority points out, they were apparently happy to have him retained at the hospital. Furthermore, in 1962 when the hospital did contact claimant's sister with the hope that he could be released for home visits, this suggestion was rejected

by his brother-in-law on the ground that it would not be safe for him to reside in a private home.

Inasmuch as the Court of Claims found in favor of the State, on this appeal we must view the facts in the light most favorable to the State and give it the benefit of every reasonable inference which can fairly be drawn from the evidence *(Owen v Rochester-Penfield Bus Co.,* 304 NY 457; *Lee v Lesniak,* 40 AD2d 756; *Kasper v Metropolitan Life Ins. Co.,* 244 App Div 508). Although this case was tried without a jury the findings of the court are still to be afforded the same effect as a jury verdict *(Matter of City of New York [Ginsberg],* 36 AD2d 156, 159). Thus where the resolution of an issue hinges upon the credibility of a witness or an inference drawn from conflicting testimony, the decision of the trier of fact should be given the greatest deference *(Amend v Hurley,* 293 NY 587, 594). In short, we may disturb the court's finding only when the preponderance of the evidence is so great that the court could not have reached the verdict it did on any fair interpretation of that evidence *(Lee v Lesniak, supra; Marton v McCasland,* 16 AD2d 781; *Rapant v Ogsbury,* 279 App Div 298).

In the instant case there was, in my opinion, more than sufficient proof for the court to draw the inference that the treatment provided by the State was neither substandard nor inadequate. Consequently, while sympathizing with the claimant's dissatisfaction with having been confined in a mental hospital for so long a period, I do not believe that he has established that this confinement was unjustified or that he was not provided adequate treatment. I would affirm the judgment.

MAHONEY, DILLON and GOLDMAN, JJ., concur with WITMER, J.; MOULE, J. P., dissents and votes to affirm the judgment in an opinion.

Judgment reversed on the law and facts with costs to claimant, claim reinstated and case remitted to Court of Claims for assessment of damages in accordance with opinion by WITMER, J.