Robert J. Mangum, J.
This claim seeks damages for the wrongful death, pain and suffering of claimant’s intestate (hereinafter "decedent”). A reading of the papers before the court indicates proper compliance with this court’s rules respecting the filing of claims.
On November 15, 1973 at 10 o’clock in the morning decedent is alleged to have swallowed 100 aspirin. Thereafter, at about 2:00 p.m. he attempted suicide by jumping in front of a school bus. The driver of the vehicle took decedent to the Monticello police. After contacting decedent’s psychiatrist, who was an employee of the State, they were advised to take decedent to the Monticello Community Hospital. While there, decedent received no medical treatment because the two doctors on call were unavailable and a third physician could not be reached. The nurse did report to the psychiatrist that decedent’s vital signs appeared within normal limits. No *592 query was made regarding what kind of examination had been conducted at that time.
Decedent was then brought to his psychiatrist’s office located in a county mental health clinic. He arrived about 3:40 in the afternoon. While there, a superficial examination revealed some symptomatology of aspirin toxicity, or salicylate poisoning. A rapid pulse rate and complaints of nausea and ringing in the ears were noted. This doctor, however, did not believe decedent ingested the quantity of aspirin claimed. No other tests were taken to remove any ambiguity observed by the symptoms, i.e., blood pressure, respiration. Recognizing his clinic did not possess the necessary facilities to care for decedent, the doctor decided to transport him to Middletown State Hospital. While en route decedent vomited. They arrived at the hospital between the hours of 4:30 and 5:00 that afternoon.
The admission application attached to decedent’s Middle-town State Hospital record describes his having taken aspirin. It is conspicuous, however, in the absence of any recommended course of treatment, omitting to describe what care decedent had received for the consumption of the aspirin, and the failure to list any physical symptoms and complaints. In a report prepared on January 8, 1974, following decedent’s death, this same physician, decedent’s psychiatrist, claimed he had reviewed decedent’s history and symptomatology with the nursing supervisor upon admission. He stated he advised the nurse that decedent should receive only clear fluids.
This physician recognized that his clinic was designed only for treatment of mental disorders and that other community medical facilities had to be relied upon for medical assistance and somatic therapy.
The decedent was admitted to Middletown Hospital at about 5:30 in the afternoon. The admitting physician did not conduct a physical examination because the patient had come into the hospital after the normal time for such procedure. His examination before trial reveals the following colloquy.
"Q. Did the doctor tell you what was done to clear the patient at the hospital (Monticello)?
"A. No, he didn’t tell me. I didn’t ask. I took it for granted, when he told me everything is okay.
"Q. Did he tell you any steps had been taken with respect to the removal of any aspirin or the contents of his stomach?
*593 "A. No
"Q. Did you ask him?
"A. I didn’t.
"Q. Did the doctor use the words he was cleared by Monticello hospital?
"A. He told me he was in Monticello hospital.
"Q. Is it that he told you the patient was merely at the hospital or did he tell you that the hospital had cleared him?
"A. I don’t remember now. I know that he said that he was in the hospital and I didn’t ask any questions.
"Q. Do you recall any other discussion with (the doctor)?
"A. No, nothing.
Later in the same examination this admitting physician claimed he did not see any signs of intoxication. Though no tests were performed, he was relying on the fact that the patient was in the general hospital and had been seen by his colleague.
The admitting doctor was only licensed to practice medicine in the Republic of Yugoslavia. He was not licensed to practice medicine within the State of New York. While at Middletown State Hospital he was participating in a psychiatric residency program.
Bearing in mind all of the foregoing, this unlicensed physician placed decedent on suicide alert and prescribed 100 milligrams of thorazine. He did not advise the medical staff on duty to notify him of any irregular reaction to the medication or to observe for other signs of toxicity. Consequently, he was not informed decedent vomited 10 minutes after receiving the medicine at 7 o’clock.
Decedent expired at about 11 p.m. on the evening of his admission. An autopsy conducted the next day at the hospital determined the cause of death as salicylate poisoning and, among other findings, aspiration of stomach contents into lungs. "An analysis of the blood serum drawn at the time of autopsy revealed a salicylate level of 202 mgs%.”
A physician is required to possess that reasonable degree of learning and skill that is possessed by the average member of the medical profession. He has a duty to exercise ordinary and reasonable care in the application of such professional knowledge and skill. In addition, the physician must use his best judgment in the application of that knowledge and skill. The *594 foregoing propositions represent the "three component duties” that form the basic theory of medical malpractice. (Hale v State of New York, 53 AD2d 1025, mot for lv to app den 40 NY2d 804.)
The rule does not hold a physician "liable for a mere error of judgment, provided he does what he thinks is best after careful examination.” (Pike v Honsinger, 155 NY 201, 210.) In the usual case, proof of the absence of these duties is dependent upon the testimony of experts. The underlying reason is that the subject matter to be inquired about may be presumed to be outside the common knowledge and experience of ordinary jurors and the inferences and facts are of such a nature as to require special knowledge or skill. An expert witness is not necessary in every case. This is particularly evident where the conditions are "of such a character as to warrant the inference of want of care from the testimony of laymen or in the light of the knowledge and experience of the jurors themselves.” (Benson v Dean, 232 NY 52, 56; Meiselman v Crown Hgts. Hosp., 285 NY 389; Cassano v Hagstrom, 5 NY2d 643, 649, dissenting opn.)
Where expert opinion is not necessary recovery may be permitted on a theory of simple negligence. In those circumstances the trier of fact measures liability upon the reasonable man doctrine.
The facts of this case are punctuated with evidence of malpractice, negligence and a want of the exercise of any reasonable judgment.
The attending or admitting physician was not licensed to practice medicine within the State of New York. At the time of administering to decedent he apparently was seeking to qualify as a psychiatrist pursuant to the authority vested in the Commissioner of Mental Hygiene. (Mental Hygiene Law, § 13.25.) This law permits the commissioner to certify a New York State licensed physician as a qualified psychiatrist provided he holds either acceptable professional recognition or meets certain requirements referred to as "Standards of equivalency.” (14 NYCRR 2.1, 2.2.) Since this doctor was without such certification or other licensed qualification in this State, he did not possess the skill or professional judgment to ” 'essentially unsupervised, provide ordinary and reasonable psychiatric medical treatment and care to this decedent.’ ” (Cohen v State of New York, 51 AD2d 494, 495-496.)
Moreover, no informed judgment was ever made after care *595 ful examination. As previously discussed, the attending physician did not conduct more than a cursory examination because of the lateness of the hour of admission. He prescribed medication of a dangerous nature about which the potential side effects of shock and irregularity of heart beat (Brown v State of New York, 56 AD2d 672, affd 42 NY2d 959) must be presumed to have been known. Instead of guarding against reasonably foreseeable risks and hazards (Excelsior Ins. Co. of N. Y. v State of New York, 296 NY 40) the attending physician ignored the warning of others and the available signs of toxicity. Even when decedent vomited after receiving the thorazine, no one was instructed or exercised the good judgment of notifying the physician who ordered the medication.
The failure to have examined decedent more thoroughly upon admission, the absence of any attention to the available history (O’Neil v State of New York, 66 Misc 2d 936), prescribing drugs when only fluids were ordered by a qualified physician (Taylor v State of New York, Claim No. 59390, filed July 26, 1977), omitting to report decedent’s reaction to the medication, failure to call a specialist on internal medicine (Meiselman v Crown Hgts. Hosp., 285 NY 389, supra), the lack of concern for any precautions and the baseless assumption that others had effectively tended to the salicylate poisoning, warrant a finding of mindless professional care and treatment, tantamount to gross negligence.
Since the wrong is hardly " 'an honest error of professional judgment made by qualified and competent persons’ (St. George v State of New York, 283 App. Div. 245, 248, affd. 308 N.Y. 681), the State cannot seek refuge behind the veil that generally protects a doctor’s medical judgment.” (O’Neil v State of New York, supra, p 940.)
Here the psychiatrists, involved in this case, recognized their own lack of sophistication concerning internal medicine and the need for a specialist. Notwithstanding, none were consulted. If a practitioner has reason to doubt, and under circumstances should doubt his competence and experience to handle a particular case, good judgment dictates the consulting of those more knowledgeable (Benson v Dean, 232 NY 52, 59, supra) or as indicated here, conducting appropriate blood tests to determine the level of aspirin poisoning.
In Pike v Honsinger (155 NY 201, supra) decided in 1898, the Court of Appeals established that the medical care, skill and diligence required of a physician was determined by the *596 standards of the community in which he practiced. The "locality rule” represented the favored malpractice doctrine in jurisdictions throughout the country at the time.* The rule had its genesis in the generally accepted theory that doctors in small communities lacked the same opportunities and resources to keep abreast as other members of their profession situated in large urban medical centers. Parenthetically, the professional competency of members of the legal profession has never been measured by a similar consideration.
Since, over the past 80 years, the medical profession has enjoyed numerous technological advances, more universal training experience expanded means of obtaining knowledge without regard to geographic considerations, re-evaluation of the rule is not without merit.
The locality rule has always had two practical difficulties: (1) scarcity of professional people in a community who were either qualified or willing to testify about local standards; (2) giving effect to a local standard of care below that which is generally found acceptable. "Negligence cannot be excused on the ground that others in the same locality practice the same kind of negligence.” (Pederson v Dumouchel, supra, p 78.) The impreciseness of the rule may also be gleaned from the following observation: "[i]f a physician fails to employ his expertise or best judgment, and that omission causes injury, he should not automatically be freed from liability because in fact he adhered to acceptable practice. There is no policy reason why a physician, who knows or believes there are unnecessary dangers in the community practice, should not be required to take whatever precautionary measures he deems appropriate.” (Toth v Community Hosp. at Glen Cove, 22 NY2d 255, 263.)
An expanding number of jurisdictions are permitting "medical witnesses from localities other than that in which the defendant practices to testify, in a malpractice case, to the standard of care that the defendant should have observed.” (Ann. 37 ALR3d 424, Malpractice-Care-Nonlocal Testimony, § 2 [a].) In some States the archaic locality rule has been broadened to include "similar communities.” This test, however, while less confining does not eradicate all the disadvantages inherent in the local community standard. The poten *597 tially careless and improper standard adopted by physicians of a particular community is still in issue.
Today, "there is no lack of opportunity for a physician or surgeon to keep abreast of the advances made in his profession and to be familiar with the latest methods and practices adopted.” (Pederson v Dumouchel, supra, p 78.) The "distinctions based on geography are no longer valid in view of modern developments in transportation, communication and medical education, all of which tend to promote a certain degree of standardization within the profession.” (Brune v Belinkoff, 354 Mass 102, 105.) Rural areas are not primitive societies too distant in time and place to take advantage of advanced learning. Neither do medical schools provide different degrees of instruction dependent upon where one intends to practice his specialty.
In this State there are appellate cases in which an emphasis has been on a general standard, free of any locality considerations. Citing from Pike v Honsinger (155 NY 201, supra) the Appellate Division, First Department, omitted any reference to locality when it stated a physician "promises by implication to use the skill and learning of the average physician” (Stone v Goodman, 241 App Div 290, 295). Again, in a decision recently affirmed by the Court of Appeals the Appellate Division, Third Department, enumerated the "three component duties” of a physician without any reference to a locality requirement. (Hale v State of New York, 53 AD2d 1025, supra.)
A change in the locality rule would not require doctors to employ the best method considered by others so long as "a method which is accepted by respectable medical authority is adopted.” (Gielskie v State of New York, 10 AD2d 471, 474, affd 9 NY2d 834; Schreiber v Cestari, 40 AD2d 1025, 1026.)
The more progressive principle adopted in sister States places the emphasis upon professional proficiency rather than geographical proximity. Unsuited as the locality rule is to present day conditions, this court respectfully urges, and will in this case adopt, acceptance of a rule promulgated by other jurisdictions. A qualified medical practitioner should be subject to liability, in a malpractice action, if he fails to exercise that degree of care and skill expected of the average practitioner in the class to which he belongs, having regard for the circumstances under which he must act, the advances of his profession and the medical resources reasonably available. *598 (Carbone v Warburton, 11 NJ 418; Pederson v Dumouchel, 72 Wn 2d 73, 79; Brune v Belinkoff, 354 Mass 102, 109.) Of course the financial resources and territorial expanse of an area as well as its population density and patient’s particular requirements will always have a bearing in determining the skill and care required.
The rigid locality rule of the 19th century, however, should give way to a principle consonant with the realities of contemporary medical knowledge and practice. No greater justification exists for the abandonment. of the local community test than in cases involving the State of New York. The State administers dozens of hospitals throughout our territorial limits. It does not practice medicine according to the different standards established in each of the communities in which it has a facility. In this context the community standard is addressed to a policy of State-wide import developed by the State’s own regulations, and statutory requirements.
Claimant’s expert was qualified to testify in this case for the purpose of informing the court of the acceptable standard of medical care that, under the circumstances, should have been utilized. Gastric lavage, administering of fluids and blood test are some nondrastic procedures that could have been employed. A thorough physical examination to check and monitor heart beat, blood pressure and respiratory functions was necessary to determine whether the aspirin poisoning had subsided or increased. The immediate reporting of any violent reaction from the thorazine to the physician in charge was another standard of acceptable care omitted. Further, prescribing thorazine in the first instance, a central nervous system depressant, was contraindicated.
The autopsy report verified death resulting from aspirin poisoning. Considering the time period involved, the procedures available for treatment, and the apparent symptoms that should have given rise to alarm in the professionally tutored, the State’s failure to evaluate more thoroughly, treat or render any medical care, together with the administering of thorazine, effectively precluded decedent from recovering from the poisoning. Judged by a fair preponderance of the credible evidence, it is reasonably certain that even the most conservative measures taken at an early hour would have saved decedent’s life.
"Even where symptoms are capable of several interpretations, normal and prudent medical procedure would dictate *599 the use of available tests and an extensive examination, which not only could have clarified the ambiguities, but detected that which was ascertainable and frustrated the otherwise natural consequences of the negligence.” (O’Neil v State of New York, 66 Misc 2d 936, 944, supra.)
In evaluating damages there was no evidence, other than mild discomfort, of any pain. Decedent’s potential for employment appeared to be limited to nonstress situations with little social interaction. The evidence revealed decedent had previous emotional conflicts requiring the assistance of professional attention. At the time of his death decedent was an unemployed, unmarried 27-year-old male, with a life expectancy of 43.8 years. Offers of employment from previous applications were received following his death. There was some evidence he worked part time for Western Union. Funeral expenses, together with all burial costs, aggregated $2,328. Bearing in mind all of the foregoing, together with decedent’s emotional problems, educational and vocational experiences, the court awards claimant $35,000, plus interest to be computed from the date of decedent’s death, November 15, 1973, to the date of entry of judgment.
Motions made by counsel for defendant at the close of claimant’s case and at the end of the entire trial to dismiss the claim, upon which the court reserved decision, are denied.

 Curiously, England has apparently never adopted the locality rule. (Pederson v Dumouchel, 72 Wn 2d 73, 79; cf. Nathan, Medical Negligence [Butterworth & Co., Ltd., 1957], p 21.)