**Kenneth JONES and Gloria Jones, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. 84 Civ. 6993 (IBC).**

United States District Court, S.D. New York.

Sept. 5, 1989.

Sebastian Randazzo, Great Neck, N.Y., for plaintiffs.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for defendant; Jordan Stanzler, Asst. U.S. Atty., of counsel.

## OPINION

IRVING BEN COOPER, District Judge.

Plaintiffs Kenneth Jones (hereafter "Jones") and his wife, Gloria Jones, brought this medical malpractice action against the Bronx Veterans Administration Hospital (hereafter "VA Hospital") pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2674 *et seq.*, alleging that the surgical procedure performed on him at the VA Hospital on August 3, 1982 was improper and unnecessary[1]; that he did not give his informed consent to the surgery as mandated by Section 2805-d of the Public Health Law of the State of New York. Further, that he was unable to walk nor-

mally as a result of the surgery performed. Plaintiff Gloria Jones asserts a claim for loss of consortium. The United States of America (hereafter "the Government") denies all allegations.

This action was tried to the Court on February 18, 19, 20 and 23, 1987. At the conclusion of plaintiff's case, defendant moved for a directed verdict; the motion was denied. At the close of trial both parties moved for directed verdicts; we reserved decision on both motions.

We base our holding on the findings of fact and conclusions of law hereinbelow.

## FINDINGS OF FACT

Kenneth Jones served in the United States Army from December 9, 1966 to November 9, 1968; he was a member of the 171st Infantry Division. (Deposition of Kenneth Jones, sworn to December 27, 1984, pp. 5–7) (hereafter K. Jones Deposition)[2]. Jones first complained of foot problems in 1967; he suffered from pain caused by calluses on the undersides of both feet; he went to the Army dispensary in Seattle, Washington, where his foot condition was treated by soaking and trimming his calluses. (Ex. 8–293)[3] He was also given cast boot braces to alleviate the discomfort of his flat feet. (K. Jones Deposition, pg. 6)

After receiving an honorable army discharge on November 9, 1968 (Ex. 8–320), Jones returned home to the Bronx, New York, where he worked as a butcher in various retail food stores. (Ex. 8–192CC; K. Jones Deposition, pg. 7)

In 1972 Jones began going to the Bronx VA Hospital for foot treatment. (Ex. 8–31; K. Jones Deposition, pp. 8, 10) The Hospital's Podiatry Department initially treated his complaints of pain on the undersides of both feet by shaving his calluses and giving him special shoes with arch supports. (K. Jones Deposition, pp. 8–9)

---

1. On December 21, 1985, subsequent to the commencement of this suit, Kenneth Jones died of a disease unrelated to his malpractice claim. As co-plaintiff and Administratrix of his estate, Gloria Jones continues this action.

2. Kenneth Jones' death prevented him from testifying at trial. *His deposition was received in evidence as Exhibit 2.*

3. The letters "Ex" followed by a number or a letter indicate exhibits admitted into evidence at trial.

In 1973 Jones made several visits to the VA Hospital to seek treatment for his foot problems, as well as other unrelated complaints. (Ex. 8–86–92) Various orthotic devices were prescribed to alleviate his pain. *Id.* That same year Jones applied to the Veteran's Administration for disability payments for the foot problems he claimed had begun during his Army service; one year later, the Veteran's Administration granted him a ten percent service-connected disability for the condition of "bilateral pes planus [flat feet] with plantar callosities [calluses on the bottom of the feet]." (Ex. 8–192M)

Jones' VA Hospital records of January 16, 1974 indicate that foot surgery, planned for February of that year, was postponed "until cellulitis [inflammation of the tissue] has completely cleared" (Ex. 8–23). The VA records do not indicate what surgical procedure was contemplated, the physician who ordered the surgery, nor why it was never performed.

VA Hospital records of February 6, 1974 indicate that Jones had a two year history of metatarsalgia [pain on the bottom of the feet], flexible flat feet, plantar callosities 2–4 [calluses on the bottom of the feet between the second and fourth toes], painful metatarsal heads, and hammering of the second toe of both feet. (Ex. 8–31) Hammering of the toes is caused by a bone deformity which causes the toe to bend downward in a fixed hammer-like position. To alleviate the pain in his feet Jones was advised by a physician at the VA Hospital to wear special wide shoes with cushioned pads. (Ex. 8–31.)

He continued to go to the VA Hospital for foot treatment during the next four years; hospital records indicate that he obtained new arch supports from the Hospital in December of 1978, December of 1979, October of 1980 and April of 1982. (Ex. 8–63; 68; 74; 88)

On June 25, 1982 Jones went to the VA Hospital complaining of "pain of both feet and swelling when standing for long periods"; the examining physician referred Jones to the Podiatry Department and an appointment was scheduled for July 2, 1982. (Ex. 8–97)[4]

Less than a month later, on July 12, 1982, Jones went to the Hospital's Orthopedic clinic complaining of severe pain in the lower back area, radiating down his legs to the bottom of his feet. (Ex. 8–99) Dr. Norman Johanson, an orthopedic surgeon and the senior resident in the orthopedic department (Tr. 207), reviewed Jones' history and examined him. (Ex. 8–100) Dr. Johanson then called in Dr. Cathleen Raggio, another resident in orthopedic surgery (Tr. 201). Dr. Raggio also examined Jones; she discussed his condition with him. *Id.* Their examinations revealed that Jones was suffering from calluses on the soles of his feet and hammertoes. (Tr. 202) Dr. Johanson wrote a Consultation Report which reflected his examination of Jones. (Tr. 207) It stated that Jones had: "longstanding metatarsalgia [pain on the bottom of both feet] and burning 2–3, 3–4 webbed spaces bilaterally [between the second and third toes of both feet]" (Ex. 8–100). The physical exam revealed:

"large plantar callosities, ... [between toes] ... 2–3 ... bilat [of both feet] Hyperextension MP 2nd toes bilat Tenderness 1st & 2nd web spaces bilat." *Id.*

Doctor Johanson's "Impression" was that Jones has "Metatarsalgia [pain on the bottom of both feet] with plantar callosities [callouses on the bottom of both feet] .. Morton's Neuroma's 1–2 web spaces [inflammation of the nerves between the first two toes]. (*Id.*)

The Report indicated that the "Plan" was to present Jones at an orthopedic conference for metatarsal osteotomies [breaking of the long bone in the foot] and hemiphalangectomies [excision of part of the phalanx (small bone in the foot)]. *Id.* The Orthopedic Conference consisted of a

4. Although plaintiff's counsel maintained that the record of Jones' July 2, 1982 visit to the Podiatry clinic was deliberately held back by the government, we do not find his argument convincing. At trial, Dr. Raggio testified that it was impossible to tell from a review of Jones' medical records whether he in fact appeared for the scheduled appointment. (Tr. 219).

group of three orthopedic residents, several attending surgeons, and the Chief of the Orthopedic Service, Dr. Bernard Jacobs. The doctors undertook to review the medical findings and reach a consensus as to what surgical procedure, if any, would benefit Jones. (Tr. 200–201).

The conference, held on July 28, 1982, was immediately preceded by another meeting between Dr. Raggio and Jones during which she again reviewed his history and examined him. (Ex. 8–107; Tr. 222.) During the conference, which Jones attended, Dr. Raggio presented his history and x-rays to the other doctors. She then examined him again while the other members of the Orthopedic Department observed and questioned her about his condition. (Tr. 227–228).

After this part of the conference, Jones left the room and the doctors discussed "the findings, the physical examination, the history and what procedure was felt best for him." (Tr. 228) Then, following the Hospital's standard procedure for authorizing any surgery, Dr. Bernard Jacobs, as Chief of the Orthopedic Surgery Department, had to give his approval of the recommended surgical procedure. (Tr. 229)

At trial the Government moved to introduce the deposition of Dr. Bernard Jacobs into evidence. (Tr. 402) Although Dr. Jacobs had been scheduled to testify as a defense witness, he suffered a stroke following heart bypass surgery, and had been advised by his cardiologist "to avoid stress and avoid testifying at trial." (Memorandum Concerning the Admissibility of the Deposition of Dr. Bernard Jacobs, dated March 19, 1987, pg. 1) (hereafter "Jacobs Memorandum"). Plaintiff opposed the introduction of Dr. Jacobs' testimony on the grounds that defendant had failed to corroborate the witness's inability to appear in Court by a medical affidavit of his treating physician, and had failed to apply to the Court for an order to conduct the deposition. (Plaintiffs' Proposed Findings of Fact and Conclusions of Law, dated April 13, 1987, pg. 11). To resolve this issue we directed the Government to submit a brief addressed to the issue of the admissibility of the Jacobs' deposition (Tr. 402).

Dr. Jacobs testified that if Jones did not undergo the recommended surgical procedure "[h]e faced persistent and increasing symptoms of the nature of which has been documented, pain, burning and increasing calluses and decreasing ability to walk.... his feet were so bad he had no choice, unless he was willing to stay in a chair for the rest of his life and not do any walking." (Deposition of Dr. Bernard Jacobs, sworn to February 18, 1986, pg. 15; 12) (hereafter "Jacobs Deposition") Following the Orthopedic Conference, Dr. Jacobs indicated that he approved of the surgery by writing a note on Jones' medical record. It read: "Preoperative note: Patient has metatarsal joint requiring condylectomies [excision of the rounded projection of the metatarsal bone] and hemiphalangectomies [excision of part of the phalanx bone] bilateral [both feet]." (Jacobs Deposition, pg. 18)

Technically referred to as "bilateral hemiphalangectomy and plantar condylectomy," the recommended operation would consist of two interrelated procedures: (1) "shav[ing] down the metatarsals so that there [would] be less pressure on the skin of the foot and the calluses [would] not come back as readily" (Jacobs Deposition pg. 11), and (2) correcting the hammering of the toes "by removing a portion of the phalanx [bone] ... thereby making the toe looser" and relieving the pressure of the toes on the skin of the feet. (Jacobs Deposition, pp. 11, 14, 12) According to Dr. Raggio, this surgical procedure is used to eliminate the two conditions of "hammering and ... metatarsalgia." (Tr. 249)

Following Dr. Jacobs' approval of this surgical procedure at the conclusion of the Orthopedic Conference, Dr. Raggio "explained to Mr. Jones that it was the opinion of the other doctors and myself that we thought he would benefit from having a surgical procedure to his toes." (Tr. 231) Dr. Raggio testified:

I explained to Mr. Jones using my words and my hands and his feet that the joints were pointed in abnormal directions; and

that in order to relieve some of his pain and discomfort, that we would actually take out part of one bone and allow the toe to come down, and then shave off the bone on the under surface of his foot.... (Tr. 234) ... I pointed to the bottom of his foot, the sole of his foot, where the calluses were and showed him that is the area where the bones were depressed, and that is the area where we would try to take off some of the bone from the undersurface. [And] With respect to the bone that extended up and then the joint went over, I explained that this would be shortened so that we could then bring the toe up and around. (Tr. 235)

Dr. Jacobs testified that he too discussed the planned surgery with Jones:

"We said to him the reason the calluses keep coming back is the metatarsals are too big ... and the only way we can help you is to shave down the metatarsals so that there will be less pressure on the skin of the foot, and the calluses may not come back as readily as they have been. As far as the hammering of the toes, we said that can only be corrected surgically by removing a portion of the phalanx of the toes involved." (Jacobs Deposition, pg. 11)

Jones agreed to have the operation (K. Jones Deposition, pg. 26). As his wife testified, he believed the recommended procedure might correct his condition:

He just said, 'They are going to relieve the pain from me and I have been going through this for so many years. And I have been going to this hospital all of my life since I have been discharged and I trust them. And they said this is what they are going to do, so I am going to go and let them hopefully correct this situation.' (Tr. 169)

Jones was admitted to the VA Hospital on July 30, 1982, (Ex. 8–111) at which time he was once again examined by Dr. Raggio. (Ex. 8–103, 104). Dr. Raggio took notes reflecting this examination. (Tr. 236) She noted under the "[h]istory" portion of her notes that the patient's main complaint was pain in both feet for thirteen years. (Tr. 237; Ex. 8–108–110)

On August 2, 1982, the day before the scheduled surgery, Dr. Raggio again discussed the surgical procedure with Jones. Explaining that he was going to "have the bilateral hemicondylectomies and proximal hemiphalangectomies" and that she was "going to explore the nerve between these two toes" Dr. Raggio says that she told him:

Now what that means is we are going to take out a piece of the bone in this toe and we are going to shave off a piece of the bone on the bottom of the foot and the bone that is right on the bottom of your foot.... [And] I said, We will look at the nerve that is in between these two toes; and if it looks like there is inflammation or a heavy thickening of it, we will remove it. If we have to do that, then the two toes would be numb since the nerve wouldn't be there.

I explained this to him, using his feet to show him. Pointing to the feet, showing where I would be making an incision and where the bone would be removed from. And I also explained it using my hands to show him. I asked him if he had questions and I asked if he understood if there were alternatives to the surgery. And I explained that he didn't have to have the surgery if he didn't want to. And if he didn't, he would still have the pain in his toes. And I explained the risks of surgery to him. The risk being the general anesthesia risk and the risk of this particular surgery being damage in the nerves or arteries, skin infections, wound infections, risk that the deformity can come back again. I explained in addition that he could have other deformities of other bones because he already had some changes in the other joints in his foot and that these could get worse. That the surgery would not prevent that. I explained to him that the purpose of the surgery was to offer some pain relief and that a perfect cosmetic result is not achievable and that we could not make a foot as good as new or as good as God had intended. I explained also the indications for surgery. Why we were doing the surgery, again that he was having a

pain in his foot, we went over those again. (Tr. 253, 254, 256)

According to Dr. Raggio, Jones asked her four questions at the conclusion of this conversation: Whether his toes would be cut off; what state he would be in post-operatively; whether he would require special shoes; and how soon he could go back to work. (Tr. 257) Dr. Raggio told him that his toes would not be amputated; that after surgery his feet would initially be in "big bulky dressings with ace wraps" and he would "then walk in a hard shoe afterwards" that "he would always have to have some sort of a protection on the shoes.... because the surgery could not alleviate the need for that." (*Id.*) She also told him "it would be about two months as an average" before he could return to work. (*Id.*)

Immediately following this exchange, Dr. Raggio gave Jones a pre-printed Hospital Consent Form. (Ex. 8–131; Tr. 259–263.) At the top of the form, in the section labeled "A–1" which asked for an identification of the operation or procedure that would be performed, Dr. Raggio wrote: "2–3, 3–4 Exploration and removal neuroma (possible); Bilateral Hemiphalangectomies (proximal) and Plantar Condylectomies (*Id.*). In the "B1" section of the form, which required that she describe the surgical procedure in layman's language, she wrote: "Take out some bone and relieve the pressure in the toes; Take out the nerves if they are inflamed."[5] (*Id.*) She also filled in the names "Drs. Falvo, Raggio, Johanson" in the section indicating who would perform or direct the operation. (*Id.*)

Following a line which read "I understand the nature of the proposed procedure(s), attendant risks involved, and expected results, as described above and hereby request such procedure(s) to be performed" Jones signed his name in full, filled in the time and date. (*Id.*) After watching him sign the form, a floor nurse, Ms. Wonder, signed the form as a witness. (*Id.;* Tr. 260–263) Dr. Raggio testified

that Jones read the consent form before signing it. (Tr. 262)

Jones' testimony is the only evidence presented by plaintiff with respect to whether or not Jones understood and consented to the surgical procedure. Therefore, an assessment of his credibility is essential at this point.

With respect to the issue of consent, the testimony of Jones is inconsistent and contradictory. Initially Jones testified that Dr. Raggio not only failed to explain the surgical procedure to him, but that she also told him that he would not be able to understand the explanation of the operation which she had written on the Hospital's consent form:

Q. Who asked you to sign that form?

A. Dr. Raggio.

Q. And did she explain, go anything [sic] to you about signing that form?

A. She just said this is a request form for surgery.

Q. Did she explain to you what was on the form?

A. She told me I couldn't read it because I'm a layman.

Q. She told you you could not read it?

A. I couldn't understand if I read it. (K. Jones Deposition, pp. 29–30)

Jones then maintains that Dr. Raggio deliberately prevented him from reading the part of the consent form which described the nature of the surgical procedure in layman's terms:

Q. ... did you read the top part....?

A. No, her hand was over it when I signed it.

Q. Whose hand was over it?

A. Dr. Raggio's.

Q. Her hand was over what?

A. Like this, and she says, here this is what we are going to do, and I never, you know, she just says this is a request form. Her hand was over the top portion of it, the request form. (K. Jones Deposition, pg. 35)

5. Doctor Raggio testified that upon her examination of the nerves during the course of surgery, no inflammation was found, and therefore the nerves were left intact. (Tr. 263)

Later in his testimony, however, Jones admits that he "made a statement earlier in the hearing about the request form that I would like to clear up." (K. Jones Deposition, pg. 77) Thereafter, he says that layman's terms had indeed been used to describe the surgical procedure (K. Jones Deposition, pg. 79) and that he had understood that his toes would be shaved in some way (K. Jones Deposition, pp. 80–81).

However, Jones then seemingly attempts to say that Dr. Raggio both did and did not explain the surgical procedure, and that he simultaneously did and did not understand what she said. The result is evasive—at best:

A. ... when this [the request form] was presented to me, only this was in, the medical terminology. And she said we are going to do this and that I would not be able to understand it anyway. I signed it ... She went somewhere, maybe, I don't know where she went, and when she came back then it was written in layman's terms.

Q. Did you see that again when it was written in layman's terms?

A. Only when she brought it back.... (K. Jones Deposition, pg. 78)

Q. Let me understand this, are you saying that what you refer to as being in layman's terms.... was shown to you after Dr. Raggio returned?

A. After I signed it.

Q. Pardon me, it was shown to you after you signed it?

A. ... She read this to me, the medical terms.... and she told me that because you are a layman, you wouldn't understand what we was going to do anyway. And that in order for them to perform surgery, I would have to sign the request form.

Q. And did she explain to you in layman's terms what they were going to do?

A. No.... (K. Jones Deposition, pg. 79)

Q. And did you discuss with her what was in Section B1 [the layman's terms section]?

A. She tried to explain again.

Q. And what did she explain?

A. A hemiphalangectomy, or whatever it says in medical terms.

Q. What about Section B1, did she explain that to you?

A. No. She just said this is what it says and the transliteration of it all. (K. Jones Deposition, pg. 80)

There are numerous additional statements and evidence which completely undermine the credibility of Jones' testimony about his alleged lack of understanding of what operation was to be performed and his alleged failure to comprehend the language of the consent form. First, Jones was not unfamiliar with consent forms; he had undergone at least two other operations at the VA hospital for which he had signed such forms. (Ex. 8–71; 52; Tr. 253). Second, two physicians persuasively testify that using their hands and Jones' feet as a reference, they pointed out and described to Jones precisely what would be done to him during surgery. (Tr. 235; 253; Jacobs deposition pp. 11–12). Third, a nurse who was assigned to Jones' floor prior to surgery corroborates the testimony of the doctors, indicating that Jones fully understood what procedure was going to be performed. (Ex. 8–126) Fourth, Jones alleges that he "thought that the tips of his toes would be shaved and/or amputated". (Plaintiffs' Proposed Findings of Fact and Conclusions of Law, dated April 13, 1987 pg. 6.) Not only is there no surgical procedure in which the tips of a patient's toes would be amputated for the condition Jones had, (Jacobs deposition, p. 23), but Jones himself says that he was never told anything by anyone that would have lead him to draw this conclusion (K. Jones deposition, p. 83), and further, when he was asked if he was ever told that his toes would be amputated, he unequivocally answered "No." (Id.) Fifth, despite Jones' protestations to the contrary, his testimony indicates that he possessed a comprehension of the English language that exceeded

that of a mere "high school graduate" who was incapable of understanding the explanations given him; he routinely used words such as "rescinded" (K. Jones Deposition, p. 71), "transliteration" (*Id.*, p. 80) and "alleviated" (*Id.*, p. 68) which demonstrate that he had a more sophisticated vocabulary than he maintained.

Furthermore, Jones' entire testimony is filled with numerous implausible and, indeed, bizarre stories. Some examples will suffice to characterize his testimony: At times, Jones claimed that he had first developed foot problems while serving in Vietnam, although he had never left the United States while in the military. (Ex. 8–95; 162) A self-admitted heroin addict for four years (Ex. 8–162), he said that he used the drug to "treat the pain" in his feet. *Id.;* (K. Jones deposition, p. 13). On August 2, 1982, the night before his scheduled operation, Jones was missing from his hospital room; he was found on the Hospital grounds by hospital police. (Ex. 8–126).

Jones claimed that during the surgical procedure, performed on August 3, 1982, several strange incidents occurred: he claims he was "partially awake throughout the whole surgery" (Ex. 8–253); that he had a "cardiac arrest" during the operation (Ex. 8–236; 256); that when he awoke in the recovery room there was "a priest standing over my bed giving me the last rites." (Ex. 8–253) Dr. Raggio testified that Jones did not wake up during surgery (Tr. 263), nor did he have a heart attack. (Tr. 264) None of Jones' medical records substantiate his claim that he was awake or that he suffered a cardiac arrest during surgery. (Ex. 8–132–141)

What transpired on August 17, 1982 when the Hospital attempted to discharge Jones provides a microcosmic look at his character and veracity. Although a patient who undergoes the type of operation which Jones had normally leaves the hospital within a week (Tr. 311), Jones remained in the Hospital for two weeks, even though he had fully recuperated. (*Id.*) He refused to be discharged (Ex. 8–162–163), and when he was told on August 17, 1982 that he had to leave the Hospital, he attempted to hit a

doctor in his room with his crutches. (*Id.*) Jones was sent to the Psychiatric Clinic the following day where he told the examining psychiatrist that he had thrown his crutches at the doctor because he had been subjected to "racial slurs"; he once again reiterated his determination not to be discharged. (Ex. 8–163) Jones testified as follows regarding his discharge from the Hospital:

Q. How did you physically leave the hospital?

A. They physically came and got me.

Q. Who did?

A. Three doctors and two physical therapists.

Q. What did they do to you?

A. They, they stormed my room and tried to physically get me dressed and to put me in a wheelchair to roll me out off the hospital grounds....

Q. What did you do?

A. Fought, defended myself.

Q. How did you defend yourself?

A. With my crutches from the bed on my back.

Q. What did you do with your crutches?

A. When they started hitting me, I started hitting them with the crutches. (K. Jones Deposition pp. 48–49).

Q. Which doctor, where did Dr. Johanson hit you?

A. He bloodied my nose—not Johanson, Conrad.

Q. How did he bloody your nose?

A. With a right hook.

Q. Where were you when this happened?

A. In the bed.

Q. Did he hit you anywhere else?

A. They swarmed me, so everybody had their shot at me. (*Id.* at 50)

Q. Dr. McGowen hit you?

A. Yes.

Q. Where did he hit you?

A. McGowen and McCoy were both down by my legs.

Q. Did they hit you on your legs?

A. Yes.

Q. With their fists?

A. I would imagine. One of them had a needle.

Q. Did anyone inject a needle into you?

A. I couldn't see after a while.

Q. Why couldn't you see?

A. It was too many. Then the head nurse came and she blocked my view.

Q. What did she do?

A. Jumped on my chest....

Q. Who did you hit with your crutches?

A. I would imagine all of them because they all came at one time.

Q. After they all came at one time, what happened to you?

A. I ended up all bloody. I had a head gash and a nose bleed, and my gums were bleeding.

Q. And what happened after that?

A. My wife walked in. (*Id.* at 51–53)

Jones' wife fails to corroborate this testimony about the "discharge battle":

Q. And were you with him when he was discharged?

A. No, I got a call at home.

Q. When for the first time did you see him after his discharge?

A. When we went to pick him up at the hospital. (Tr. 173)

Jones' complaints with respect to the racial slurs and physical abuse were investigated by the VA (Ex. 8–399); the staff members questioned denied that the alleged incidents had occurred. (Jacobs' Deposition, pg. 19). The evidence suggests that Jones may have had an ulterior motive for wanting to remain in the Hospital; if he extended his stay to twenty-one days, he could have increased his VA disability rating from its then-current 10% to a 100% disability rating. (Jacobs Deposition p. 19; Tr. 84–85). In fact, on August 6, 1982—just three days after surgery—Jones wrote a letter to the Veteran's Administration requesting such a disability increase. (Ex. 8–193D) Despite his protestations, Jones was discharged from the Hospital on August 19, 1982; he says he agreed to leave only because he "feared for his life" (K. Jones Deposition, p. 54)

We find Jones' testimony so inherently inconsistent and contradictory and so riddled with fantastic allegations that it is impossible for us to ascertain if—or when—Jones is telling the truth. During a Veteran's Administration hearing, Jones once described himself—under oath—as being "... of unsound body and mind.... and locked in a time zone...." (Ex. 8–193G–194) Since this admission is characteristic of Jones' testimony throughout this suit, we are positively compelled to reject his testimony in its entirety.

After his discharge from the Hospital, Jones says he "never walked since.... (K. Jones Deposition, p. 45), and that the operation had "made a modern-day Frankenstein out of me." (*Id.*, p. 89).

Plaintiff presents only one witness, Dr. Stephen Smirlock, in support of Jones' claim that he was injured and permanently incapacitated as a result of the surgery. Dr. Smirlock is a licensed podiatrist (Tr. 10); he has not been trained in nor licensed to practice orthopedic medicine or surgery. He testified that his knowledge of orthopedics was based on having read a few textbooks on orthopedic problems, attending a few lectures on the subject, and speaking to one orthopedist. (Tr. 19–20; 66–9; 75; 77) Dr. Smirlock testified that his knowledge of Jones' actual condition prior to surgery is similarly limited. Although he examined Jones twice, on April 20 and November 8, 1984, he did so solely for the purposes of testifying in this case (Tr. 78–79). He admits that he did not obtain a thorough medical history of Jones (Tr. 79–81); in fact, he did not examine Jones' X-rays (Ex. 8–112) or review Jones' entire medical file until the morning of trial. (Ex. 8–83) Moreover, Dr. Smirlock acknowledges that he did not know Jones' specific physical condition in 1982 when the surgical procedure in question was recommended:

Q. You don't really know what his condition was in August 1982, do you?

A. No, I had not seen him then, no.

Q. You really don't know how severe his problems then were in 1982, do you?

A. No.

Q. And you described that he had a hammertoe. You don't know how severe that hammertoe was, do you?

A. No.

Q. He had calluses on his feet. You don't know how severe those calluses were, isn't that correct?

A. Correct. (Tr. 82)

Despite his lack of information as to Jones' condition in 1982, Dr. Smirlock initially maintains that a procedure called an "osteotomy" should have been performed on Jones as opposed to the surgical procedure done by the VA Hospital. (Tr. 46) Later in his testimony, however, Dr. Smirlock acknowledges that an osteotomy would not have corrected Jones' hammertoes—one of the two interrelated problems the surgery was to correct:

Q. Doctor, are you stating that you would do a procedure that would leave Mr. Jones with his hammertoes, uncorrected?

A. If the problem was strictly with the metatarsals, yes, I would.

Q. You don't know if the problem was with the metatarsals or hammertoes?

A. That is correct. There was no mention of hammertoes in the admitting form. It was all metatarsalgia with possible neuroma. (Tr. 118–119)

Q. Do you know of any authorities in the medical literature which indicate that this procedure [that was performed] should not be performed?

A. Yes.

Q. What authorities?

A. I did not bring them with me today, but three textbooks and each one of them said this procedure had very inherent risks. And one of the books said it should be avoided. (Tr. 110)

Thus, Dr. Smirlock commits himself to the position that the operation performed by the VA Hospital was neither necessary nor proper, while simultaneously acknowledging that he has no legitimate reason to maintain this position, since it merely reflects his personal judgment.

Q. You would have done surgery one way and these doctors did it another way. Isn't that a question of judgment?

A. Yes....

Q. There is more than one surgical technique to address the problems that Mr. Jones has, isn't that correct?

A. Yes.

Q. And there are probably other techniques than the ones we have mentioned, the ones the doctors did, the ones you said you would have performed and probably many other ways, isn't that correct?

A. Yes.

Q. It is not as though there is just one proper way to do this procedure, isn't that correct?

A. Yes.

Q. And the type of procedure one uses is a question of judgment based upon the condition of the patient prior to surgery, isn't that correct?

A. Yes. (Tr. 138–139)

Further, despite the dubious foundation of his judgment, Dr. Smirlock steadfastly refuses to question his own appraisal of Jones condition after surgery, even when confronted with convincing medical evidence that his view of Jones' condition had been incorrect. For example, with respect to a report of a physical examination of Jones performed on February 11, 1985 that found that there was "no evidence" to support Jones' claim that "he is a paraplegic;" that he had "no gait abnormalities"; that "patient tends to exaggerate his symptoms" (Tr. 105), Dr. Smirlock testified as follows:

Q. You discount this report and give it no importance?

A. Based on my findings because it is contradictory to what I found.

Q. If another doctor finds something contradictory to what you find, you discount the other doctor?

A. I don't discount it, but I have trust in my own judgment....

Q. ... findings of those [other] doctors would not lead you to question your own diagnosis or findings?

A. Correct. (Tr. 106–107.)

We find the testimony of plaintiff's expert, Dr. Smirlock, to be neither expert nor credible under these circumstances. Given his lack of medical knowledge regarding the surgical procedure performed by the VA Hospital, his lack of specific knowledge about Jones' medical condition at the time of surgery, and the contradictions that run throughout his entire testimony, we have no alternative but to reject his testimony *in toto.*

Beyond Dr. Smirlock's testimony, there is nothing in the trial record to support plaintiff's claim that Jones was injured as a result of the surgery performed at the VA Hospital. Furthermore, the Government presents an overwhelmingly persuasive case, grounded in medical findings from many unrelated and credible sources, that Jones' allegation of being crippled as a result of surgery has no medical foundation.

Physical examinations of Jones conducted in January and March of 1983 reveal that he was advised to discard his crutches and begin exercising (Ex. 8–180A), and that he had no need for crutches, but could walk, even without limping (Ex. 8–180H). Examinations in June of the same year indicate that a neurologist believed Jones might have been "faking his symptoms" by voluntarily restricting his foot motions during examination and that he had exhibited a motor reflex which evidenced his ability to walk normally. (Ex. 8–182; Tr. 314) Likewise, examinations of Jones conducted during 1984 reveal that there was no "necessity for patient using the orthotic devices—orthopedic shoes nor the use of crutches" and "... no apparent reason for him to avoid walking in a plantigrade normal manner." (Ex. 8–238) A further examination on February 11, 1985 indicated

"[T]here are no gait abnormalities" and that "Patient tends to exaggerate his symptoms." (Ex. 6) Records from Jacoby Hospital, where Jones was hospitalized from September 18, 1985 until his death on December 21, 1985 reveal that he was "ambulating ad lib [freely] with a steady gait" less than a month before he died. (Ex. Cl; Tr. 327)

One of defendant's medical experts, Dr. Marvin Shelton, Chief of Orthopedics at Harlem Hospital and Associate Professor of Clinical Orthopedic Surgery at Columbia University College of Physicians and Surgeons (both positions held for over twenty two years), examined Jones on December 19, 1984. (Tr. 364) He testified as follows with respect to his findings:

I was convinced that he could walk without crutches or braces, but he literally refused to. I demonstrated and observed during the course of the examination that he could flex his hips to an angle of 90 degrees as in sitting and allowed the knee to be extended 90 degrees, which is exactly the same as bending over; yet he refused to bend over. There are some conditions where one because of more acute anxiety bordering on hysteria may exhibit findings like this, but in many instances, there is no hysteria there. For some reason the patient wants to portray an entirely different physical condition than actually exists. And that is what you call malingering. (Tr. 366)

Defendant's other expert, Dr. Richard Schoenfeldt, a licensed neurologist on the staff at New York Hospital/Cornell Medical Center and assistant professor of neurology at Cornell Medical College, supports Dr. Shelton's view, indicating that what Jones claimed was wrong with him was not supported by what examining physicians actually observed (Tr. 314):

I believe largely that there is a tremendous disparity between Mr. Jones' claims in the case and the documented observations of medical observers, the documented laboratory tests that are available. Mr. Jones makes some fairly wide ranging claims. Claims that would be very,

very difficult to have occurred given his very limited surgery. And those claims simply are not substantiated by the observations, laboratory and clinicals that occur in his medical record. (Tr. 309)

Likewise Dr. Bernard Jacobs, a professor of orthopedics at Cornell University and Chief of Orthopedics at the VA Hospital for 23 years, examined Jones before and after surgery. He testified that following the type of surgery Jones underwent he would be able to walk *better* (emphasis added) than he did prior to surgery, because the surgery would prevent the calluses from coming back as rapidly or severely as they did before surgery. (Jacobs Deposition, pg. 15) Jones' motivation, i.e. whether he was exaggerating some minor symptoms or entirely faking them, is irrelevant to deciding whether or not he was injured as result of the surgery performed at the VA Hospital.[6] Whatever the reasons for his behavior during the physical examinations in the lengthy period following surgery, the weight of the evidence presented regarding Jones' medical condition convinces us that Jones was not injured or permanently incapacitated as a result of the operation performed at the VA Hospital.[7] We find credible the proof adduced by defendant.

## CONCLUSIONS OF LAW

I. *Admissibility of the Deposition of Dr. Bernard Jacobs*

■ Prior to addressing the substantive issues in this case, we must dispose of the objection by counsel for plaintiff to which we reserved decision, with respect to the admissibility of the deposition of Dr. Bernard Jacobs.

Federal Rule of Civil Procedure 30(b)(1) provides, in pertinent part: "A party desiring to take the deposition of any person upon oral examination shall give reasonable notice in writing to every other party to the action. The notice shall state the time and place for taking the deposition and the name of and address of each person to be examined...." *See F.A.A. v. Landy*, 705 F.2d 624, 634 (2d Cir.1983). On February 3, 1987 the Government informed plaintiff's counsel that the Jacobs deposition would take place eight days later, on February 11, 1987, at Dr. Jacobs' office in New York City. (*Jacobs Memorandum*, pg. 1) We find plaintiff was given reasonable notice of the scheduled deposition. Furthermore, the Federal Rules of Civil Procedure provide that a court may use a deposition "against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof...." if the court finds "that the witness is unable to attend or testify because of age, illness, infirmity, or imprisonment." Fed.R.Civ.P. 32(a)(3)(C). See *Scarfarotti v. Bache & Co.*, 438 F.Supp. 199, 202 (S.D.N.Y.1977). Based on the medical information submitted by the Government regarding Dr. Jacobs' health, there is no doubt that his physical condition was serious enough to prevent him from appearing at trial.

Accordingly, we find there is no merit to plaintiff's position with respect to the admissibility of the Jacobs deposition; we therefore admit the testimony of Dr. Bernard Jacobs in its entirety.

II. *The Substantive Claims*

Plaintiff premises this suit on the following three claims: 1) That the VA Hospital

---

**6.** With regard to Jones' attempts to get the Veteran's Administration to increase his disability pay to 100%, it is worth noting that he did not succeed—despite his unremitting campaign to do so. From the time of his surgery until July 30, 1984, Jones filed at least six claims and/or appeals with the Veteran's Administration, claiming that he was entitled to 100% disability. After conducting a series of medical examinations and/or hearings, the Veteran's Administration consistently rejected his demands for an increase to 100% disability. Furthermore, the VA doctors concluded that "[t]he objective findings do not correlate with the subjective complaints made by the patient. It is the opinion of the Board that the surgery performed on his feet has no bearing on the disabilities claimed by the patient. The Board recommends psychology/psychiatry evaluation. (Ex. 8–193D, 193G; 196; 198; 215; 235–237; 240; 259–250).

**7.** It is worth noting with respect to Jones' claim that surgery had made him unemployable that he made no attempt to seek employment following his release from the hospital. (K. Jones Deposition, pg. 65)

committed medical malpractice by performing an improper and unnecessary operation on Jones on August 3, 1982; 2) that the surgery was performed in violation of Section 2805–d of New York State's Public Health Law because Jones did not give his informed consent to the surgery; and 3) that plaintiff Gloria Jones was consequently deprived of her husband's consortium. We shall discuss each of these claims in turn.

## MEDICAL MALPRACTICE

■ Under the Federal Tort Claims Act, 28 U.S.C. § 2674, the United States shall be liable "... in the same manner and to the same extent as a private individual under like circumstances ..." for tort claims against the government, and liability will be determined according to the "law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Jones' malpractice claim against the VA Hospital, which is located in the Bronx, New York, is therefore governed by the law of the State of New York.

Under New York law, there are "... three component duties which a physician owes his patient, i.e., (1) a duty to possess the requisite knowledge and skill such as is possessed by the average member of the medical profession; (2) a duty to exercise ordinary and reasonable care in the application of such professional knowledge and skill; and (3) the duty to use his best judgment in the application of this knowledge and skill." *Hale v. State*, 53 A.D.2d 1025, 386 N.Y.S.2d 151, 152 (4th Dep't 1976); *Pike v. Honsinger*, 155 N.Y. 201, 209, 49 N.E. 760, 762 (1898). *See also Jones v. United States*, No. 83–6785, slip op. at 17, 1986 WL 1459 (S.D.N.Y. January 28, 1986); *Littlejohn v. State of New York*, 87 A.D.2d 951, 952, 451 N.Y.S.2d 225, 226 (3rd Dep't 1982); *Stone v. Goodman*, 241 A.D. 290, 295, 271 N.Y.S. 500, 507 (1st Dep't 1934); *Jacques v. State*, 127 Misc.2d 769, 771, 487 N.Y.S.2d 463, 465–466 (N.Y.Ct.Cl.1984); *Hirschberg v. State*, 91 Misc.2d 590, 593, 398 N.Y.S.2d 470, 472 (N.Y.Ct.Cl.1977).

With regard to the malpractice claim, plaintiff does not allege that the surgery was improperly performed, but rather that it was an "improper and unnecessary procedure" *Verified Complaint*, Para. 8.

New York law is clear that "[T]he rule requiring [a physician] to use his best judgment does not hold him liable for a mere error of judgment, provided he does what he thinks is best after careful examination." *Pike*, 155 N.Y. at 210, 49 N.E. 760; *Hirschberg*, 398 N.Y.S.2d at 472. Moreover, a physician is not liable when he uses a "... medically acceptable and proper [procedure] under the circumstances ..." when there are "alternative procedures" available to him. *Schreiber v. Cestari et. al.*, 40 A.D.2d 1025, 1026, 338 N.Y.S.2d 972, 974 (2d Dep't 1972), *citing, Gielskie v. State*, 10 A.D.2d 471, 200 N.Y.S.2d 691, 694 (3rd Dep't 1960), *aff'd*, 9 N.Y.2d 834, 175 N.E.2d 455, 216 N.Y.S.2d 85 (1961). A mere honest error of professional judgment or a difference in opinion as to how a procedure should be performed is not sufficient to form the basis for liability. *St. George v. State of New York*, 283 A.D. 245, 248, 127 N.Y.S.2d 147, 150 (3rd Dep't), *aff'd*, 308 N.Y. 681, 124 N.E.2d 320 (1954); *Zito v. Friedman*, 77 A.D.2d 514, 515, 430 N.Y.S.2d 78, 80 (1st Dep't 1980); *Gielskie v. State*, 10 A.D.2d at 471, 200 N.Y.S.2d 691.

Despite this unambiguous legal principle, plaintiff attempts to rest the claim for medical malpractice on the testimony of one expert, Dr. Stephen Smirlock. Dr. Smirlock contends that he had a different opinion from the orthopedic surgeons at the VA Hospital with respect to what surgical procedure should have been performed on Jones. Furthermore, as we noted previously, Dr. Smirlock acknowledges that the procedure he recommended, an osteotomy, would not have corrected one of Jones' two problems, i.e. hammertoes. Even if Dr. Smirlock had convincingly maintained that an osteotomy was a viable alternative treatment for Jones' condition, such a personal opinion and differing professional judgment would not support a malpractice claim.

Additionally, we question whether Dr. Smirlock's training is such that he was in a

position to knowledgeably evaluate the treatment Jones received at VA Hospital. In fact, Dr. Smirlock acknowledges that he knew nothing about the condition of Jones' feet when he concluded that an osteotomy should have been performed. Furthermore, Dr. Smirlock is licensed as a podiatrist, not an orthopedic surgeon and he therefore lacks both the knowledge of and experience in performing—or evaluating— the orthopedic procedure in question.

In juxtaposition with Dr. Smirlock's testimony is the testimony of the government's witnesses, who persuasively demonstrated that the doctors in the Hospital's Orthopedic Department fully utilized their professional knowledge and skills in treating Jones. At the time Jones consulted the VA doctors, he had spent over a decade treating his foot condition by two particular non-surgical means, but neither debridement [shaving of his calluses], nor orthotics [special shoes] had alleviated his foot pain. In recommending that Jones undergo what the government's experts, all experienced orthopedic specialists, described as a "common" and "routine" operation (Tr. 362; Jacobs Deposition, pg. 16) for correcting Jones' two interrelated conditions, the treating physicians were clearly exercising their professional duties well within the parameters of reasonable care.

Since plaintiff has failed to establish that the surgical procedure performed at the VA Hospital was in any way a manifestation of unreasonable care, or that the doctors failed to use their best judgment in treating Jones, we hereby dismiss plaintiff's medical malpractice claim against the VA Hospital.

### INFORMED CONSENT

Plaintiff's second claim is predicated on informed consent, as governed by § 2805–d of New York's Public Health Law, which provides, in pertinent part:

1. Lack of informed consent means the failure of the person providing the professional treatment or diagnosis to disclose to the patient such alternatives thereto and the reasonably foreseeable risks and benefits in-

volved as a reasonable medical practitioner under similar circumstances would have disclosed, in a manner permitting the patient to make a knowledgeable evaluation....

3. For a cause of action therefor it must also be established that a reasonably prudent person in the patient's position would not have undergone the treatment or diagnosis if he had been fully informed and that the lack of informed consent is a proximate cause of the injury or condition for which recovery is sought.

Thus to sustain an action based on lack of informed consent, plaintiff must make three showings: 1) that the treating physicians did not disclose to him the alternatives, risks and benefits of surgery so that he could "make a knowledgeable evaluation" of their proposal. NY Public Health Law § 2805–d(1); *Ogden v. Bhatti*, 92 A.D.2d 658, 460 N.Y.S.2d 166, 167 (3rd Dep't 1983); *Troy v. Long Island Jewish Hillside Medical Center*, 86 A.D.2d 631, 632, 446 N.Y.S.2d 347, 349 (2d Dep't 1982); 2) that if he had been fully informed "a reasonably prudent person in the patient's position would not have [consented to] the treatment ..." N.Y. Public Health Law § 2805–d(2); *Brandon v. Karp*, 112 A.D.2d 490, 492, 490 N.Y.S.2d 904, 906 (3rd Dep't 1985); *Joswick v. Lenox Hill Hospital*, 134 Misc.2d 295, 297, 510 N.Y.S.2d 803, 805 (N.Y.Sup.Ct.1986); and 3) that his lack of informed consent is "a proximate cause of the injury or condition for which recovery is sought." N.Y. Public Health Law § 2805–d(3); *Flores v. Flushing Hospital and Medical Center*, 109 A.D.2d 198, 201, 490 N.Y.S.2d 770, 772 (1st Dep't 1985); *Crisher v. Spak*, 122 Misc.2d 355, 361, 471 N.Y.S.2d 741, 743 (N.Y.Sup.Ct.1983); *Barnette v. Potenza*, 79 Misc.2d 51, 55, 359 N.Y.S.2d 432, 438 (N.Y.Sup.Ct.1974).

#### (1) *Disclosure*

■ Defendant persuasively demonstrates that the VA doctors explained and disclosed to Jones the risks and benefits of the proposed surgical treatment. The portion of the consent form written in layman's terms is straightforward: "Take out

some bone and relieve the pressure in the toes; take out the nerves if they are inflamed." (Ex. 8–131) Jones read, signed and dated this form. Moreover, on at least four separate occasions, hospital physicians described the nature and purpose of the operation to Jones in clear and simple language. Additionally, on at least two occasions, Dr. Raggio used her hands and Jones' feet to describe to him exactly what would be done during surgery. She answered all the questions that Jones had with respect to the proposed surgery, and she also advised him that he did not have to undergo the surgery if he did not want to. Moreover, throughout his treatment at the Hospital, Jones gave no indication that he either required or wanted additional information from the treating physicians. The record reveals that Jones did not question whether he had been sufficiently informed until well past the performance of the surgery—when he initiated this action.

### (2) Consent

■ Plaintiff also fails to demonstrate that a reasonably prudent person in Jones' condition would not have undergone the surgical treatment if he had been fully informed. Jones had suffered from foot problems for at least thirteen years prior to the surgery. He had tried various non-surgical treatments in an attempt to alleviate his foot pain; none of these non-surgical alternatives relieved his symptoms. Jones was advised by the doctors at the VA Hospital that he faced a lifetime of increased pain and a decreased ability to walk if he decided not to undergo the surgery. In fact, Jones testified that he chose to have the operation after having been advised of its nature and purpose; he signed the consent form authorizing the surgery. Jones' wife corroborates his testimony that he wanted to have the surgery to alleviate his foot pain. When questioned as to why he had signed the consent form and if he wanted surgery, Jones admitted that he wanted to do whatever was necessary to relieve his pain. (K. Jones Deposition pg. 30) In light of the above, we find that plaintiff has failed to establish that a reasonably prudent person in Jones' position would not have consented to the surgery.

### (3) Causality

■ Even assuming that the treating physicians at the VA Hospital had not obtained Jones' informed consent, to maintain a malpractice action based on lack of informed consent, Jones would have to establish that there was a causal relationship between the absence of consent and a consequent injury. Jones has failed to demonstrate this aspect of his claim. As indicated previously, the weight of the evidence regarding Jones' physical condition subsequent to surgery persuades this Court that Jones was not injured or disabled as a result of the surgery. The evidence overwhelmingly establishes that Jones was physically able to walk and that he appeared to be exaggerating and/or faking his symptoms.

For the foregoing reasons, the Court therefore dismisses plaintiff's claim predicated on lack of informed consent.

### LOSS OF CONSORTIUM

■ Plaintiff's third claim seeks recovery for Gloria Jones' loss of consortium. A claim for loss of consortium is a derivative one, and can only be sustained if defendant is found to have been negligent on the primary claim. *Maddox v. City of New York*, 108 A.D.2d 42, 49, 487 N.Y.S.2d 354, 359 (2d Dep't) (1985), *aff'd*, 66 N.Y.2d 270, 487 N.E.2d 553, 496 N.Y.S.2d 726; *Belanoff v. Grayson*, 98 A.D.2d 353, 358, 471 N.Y.S.2d 91, 98 (1st Dep't 1984). Where the claims of the husband are dismissed, the claim of the wife for loss of consortium must also be dismissed. *Bloss v. United States*, 545 F.Supp. 102, 105 (N.D.N.Y. 1982). Since we have dismissed the medical malpractice and lack of informed consent claims, plaintiff Gloria Jones' claim for loss of consortium must also be dismissed.

### CONCLUSION

Accordingly, the complaint is dismissed in its entirety.

SO ORDERED.